5 F.3d 545
NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 CONTINENTAL BANK, N.A., formerly known as Continental
Illinois National Bank and Trust Company of
Chicago, Plaintiff-Appellee,
and
Federal Deposit Insurance Corporation, Receiver, Substituted
for First National Bank & Trust Company of
Oklahoma City, Oklahoma, Plaintiff,
v.
James E. BURKE, Trustee for Atex Oil Company of Texas, now
known as ATB Realty Company, and Atex Oil Company of New
Mexico, now known as ATC Realty Company; Atex Refining
Company; and Ray Bell, Defendants-Appellants,
and
Atex Oil Company, Atex Stations, Inc., Anson Refining Co.,
Atex Pipeline Co., Anson Pipeline Co., Oklahoma
Pipeline Co., and Anderson-Prichard Pipe
Line Corporation, Defendants.
CONTINENTAL BANK, N.A., formerly known as Continental
Illinois National Bank and Trust Company of
Chicago, Plaintiff-Appellant,
and
Federal Deposit Insurance Corporation, Receiver, Substituted
for First National Bank & Trust Company of
Oklahoma City, Oklahoma, Plaintiff,
v.
James E. BURKE, Trustee for Atex Oil Company of Texas, now
known as ATB Realty Company, and Atex Oil Company of New
Mexico, now known as ATC Realty Company; Atex Refining
Company; and Ray Bell, Defendants-Appellees,
and
Atex Oil Company, Atex Stations, Inc., Anson Refining Co.,
Atex Pipeline Co., Anson Pipeline Co., Oklahoma
Pipeline Co., and Anderson-Prichard Pipe
Line Corporation, Defendants.
 Nos. 91-6260, 91-6278.
 United States Court of Appeals, Tenth Circuit.
 Sept. 14, 1993.
 
 Before EBEL, McWILLIAMS, and BRORBY, Circuit Judges.
 ORDER AND JUDGMENT[1]
 EBEL, Circuit Judge.
 
 
 1
 The appellants appeal the district court's finding under the Oklahoma Securities Act that, although the appellees violated the Oklahoma nonregistration provision, the appellants are entitled to no monetary relief. The appellees cross-appeal the district court's finding that the appellants are entitled to attorneys' fees as prevailing parties under the Oklahoma Securities Act when the appellants were awarded no relief on their nonregistration claim. We affirm the district court's finding that the appellants are entitled to no monetary relief, and we dismiss the cross-appeal on the attorney's fee issue for lack of jurisdiction.
 
 FACTS
 1. THE PLAYERS
 
 2
 Appellant Ray Bell owned and operated numerous gasoline service stations in the southwest through various corporations in which he held a controlling interest. Bell and his family owned a 100 percent interest in appellant ATEX Oil Company of New Mexico ("ATEX N.M."),[2] which in turn owned 100 percent of the shares of appellant ATEX Oil Company of Texas ("ATEX Tx."),[3] which in turn owned 100 percent of the shares of appellant ATEX Refining Company (ATEX Rf.") (collectively, "the ATEX Group").
 
 
 3
 Carl Anderson, who is not a party to this appeal, produced crude oil. He too owned a series of interrelated companies, including An-Son Corporation, An-Son Transportation Company, An-Son Pipeline Company, and An-Son Refining Company (collectively, "An-Son"). None of the An-Son corporations are parties to this appeal.
 
 
 4
 In 1978, the ATEX Group formed a general partnership called Oklahoma Refining Company ("ORC") with An-Son and others.[4] An-Son and the ATEX Group eventually bought out the other partners' interests: after the buy out, the ATEX Group owned 34 percent of ORC, while An-Son owned 66 percent. At the time ORC was formed, ORC borrowed $20 million from First National Bank of Oklahoma City ("First National"), which it used to buy a refinery and fund operations. First National immediately sold an interest in the loan to appellee Continental Bank, N.A.[5] The loan was secured by nearly all of ORC's assets--the oil refinery, all inventory, accounts receivable, equipment, and supplies. In addition, Anderson and An-Son Corporation guaranteed 66 percent of ORC's obligations to the banks, while Bell and ATEX N.M. guaranteed 34 percent. ORC subsequently increased its indebtedness to Continental and First National (collectively, "the Banks").
 
 2. THE ORC BUY OUT
 
 5
 Between late 1982 and early 1983, the Anderson and An-Son guarantors, the Bell and ATEX guarantors, and the Banks discussed the possibility that Bell and the ATEX Group might buy out An-Son's interest in ORC. On March 28, 1983, An-Son and the ATEX Group entered into a Reorganization Agreement. The agreement provided that An-Son would transfer its interest in ORC to the ATEX Group. In exchange, Bell and the ATEX Group agreed to execute an Assumption Agreement, in which they would assume certain ORC-related liabilities for which An-Son could otherwise be held responsible.
 
 
 6
 At the closing on April 12, 1983, An-Son transferred to the ATEX Group[6] 100 percent of its stock in An-Son Refining, the designated An-Son company that was a general partner in ORC.[7] In exchange, the ATEX Group executed an Assumption Agreement, in which it promised to indemnify certain An-Son entities for specified liabilities incurred by ORC. In addition, as a prerequisite to obtaining the Banks' release of the An-Son guarantors' guaranty obligations, Bell and the ATEX Group also executed new guaranties ("the 1983 Guaranties"), which guaranteed, among other things, the payment of all indebtedness owed by ORC to the Banks.[8] Thus, whereas before the stock sale on April 12, 1983, Bell and ATEX N.M. were liable as guarantors for 34 percent of ORC's obligations to the Banks, after that date Bell and the entire ATEX Group were jointly and severally liable for 100 percent of ORC's obligations.
 
 3. HISTORY OF THE LITIGATION
 
 7
 On September 14, 1984, ORC filed a voluntary Chapter 11 bankruptcy petition. On September 25, 1984, the Banks filed suit against Bell and the ATEX Group to enforce their guaranty obligations with respect to ORC. Bell and the ATEX Group counterclaimed against the Banks, asserting federal and state securities fraud, state common law fraud, breach of contract, breach of warranty, state securities registration violations, and violations of a federal law prohibiting tying arrangements--all of which allegedly arose in connection with the Reorganization Agreement. The counterclaims stemmed from what Bell and the ATEX Group claimed was an attempt by the Banks to find a "donkey" to absorb losses the Banks expected to suffer on the ORC loans in the future. They alleged that the Banks realized that the energy market was rapidly declining, that they were undersecured on the ORC debt, that An-Son could not service its debt or ORC's debt, and that An-Son had no more property to pledge. According to Bell and the ATEX Group, the Banks therefore targeted them to take over An-Son's liability because Bell and the ATEX Group had a large amount of unencumbered property that could protect the Banks from a collateral shortfall on ORC.
 
 
 8
 Through a series of transactions, the Federal Deposit Insurance Corporation became the holder of the Banks' ORC loans. As part of a financial assistance agreement, the FDIC purchased Continental Illinois' interest in the ORC debt on September 26, 1984, and was substituted as plaintiff for Continental Illinois on April 12, 1985. In July 1986, First National was declared insolvent and closed. The FDIC was appointed as receiver for First National, and acquired First National's ORC-related debt in its corporate capacity. The FDIC was then substituted for First National as plaintiff. Once the FDIC became the holder of 100 percent of the Banks' ORC-related debt, the FDIC continued to prosecute the collection action initiated by the Banks.
 
 
 9
 On February 22, 1988, the FDIC obtained judgments in the collection action against Bell, the ATEX Group, and others for 100 percent of the then-outstanding balance of ORC's debts, $51,604,074.60. We affirmed that judgment on appeal. FDIC v. Bell, 892 F.2d 64 (10th Cir.1989), cert. denied, 496 U.S. 913 (1990).
 
 
 10
 Meanwhile, the counterclaims asserted against Continental by Bell and the Atex Group had been severed and went to trial separately. The district court entered judgment in favor of Bell and the ATEX Group for the same amount for which they had been found liable to the FDIC on the basis of the jury's finding of common law fraud, state and federal securities fraud, and violations of the Oklahoma Securities Act registration provision. On appeal, we reversed the finding that Continental was liable for federal and state securities fraud and state common law fraud, but affirmed the finding of liability on the nonregistration count. Order and Judgment, No. 88-2274. We remanded the case for a redetermination of the damages that Bell and the ATEX Group were entitled to recover.
 
 
 11
 On remand, the district court notified the parties prior to the retrial that, under 71 Okla.Stat.Ann. 408(a)(2)(i) and pursuant to the Tenth Circuit remand, Bell and the ATEX Group were entitled to recover the consideration they paid for the An-Son stock, plus interest, costs, and attorneys fees and less any income they received on the securities. Both sides agreed that the only consideration paid by Bell and the ATEX Group were the 1983 Guarantees and the Assumption Agreement. However, the parties disagreed on the proper method to be used in determining the value of the guarantees. At a pretrial conference, the district court informed the parties that the consideration paid by Bell and the ATEX Group would be valued as the amount of new debt undertaken by Bell and the ATEX Group, less the value of the collateral securing the debt guaranteed.[9] Both figures were to be measured as of April 12, 1983, the date of the securities transfer.
 
 
 12
 Following a three-day bench trial, the district court on June 6, 1991, issued an opinion finding that the new amount of debt covered by the 1983 Guaranties did not exceed $51,638,265[10] and that the value of the collateral securing the bank debt was $56,460,859.40. Thus, because the value of the collateral securing the debt exceeded the value of the new debt undertaken by Bell and the ATEX Group, the district court concluded that Bell and the ATEX Group paid no valuable consideration for the securities.[11] The court therefore held that Bell and the ATEX Group should take nothing from Continental on the securities nonregistration claim.
 
 
 13
 On June 27, 1991, the district court granted Bell and the ATEX Group's motion for entry of partial final judgment on the June 6, 1991 opinion so that they could appeal the court's calculation of damages. On the same day, the district court entered a partial final judgment that incorporated the June 6, 1991 opinion decreeing that Bell and the ATEX Group take nothing from Continental.
 
 
 14
 Bell and the ATEX Group appeal the June 27, 1991 judgment and the June 6, 1991 opinion it incorporated. They contend that the district court erred (1) in its use of the formula set forth in 71 Okla.Stat.Ann. 408 to determine their relief and (2) in applying the formula, assuming that the formula is the proper measure of their relief. Continental cross-appeals, contending that the district court erred in finding Bell and the ATEX Group to be prevailing parties entitled to attorneys' fees under the Oklahoma Securities Act. We affirm the district court's finding that Bell and the ATEX Group are not entitled to monetary relief, and we dismiss Continental's cross-appeal for lack of jurisdiction.
 
 DISCUSSION
 
 15
 1. PROPRIETY OF THE DISTRICT COURT'S DAMAGES FORMULA
 
 
 16
 Bell and the ATEX Group first contend that the district court did not use the proper formula under Oklahoma law to determine the amount of relief to which they are entitled. The district court decided that under 71 Okla.Stat. 408, Bell and the ATEX Group were entitled to the consideration they paid for the An-Son securities, plus interest, costs, and attorneys fees and less any income they received on the securities. Bell and the ATEX Group, however, argue that 408 requires a court to apply equitable principles and to return the victims to the position they were in before the securities transaction took place. Because rescission is now impossible, Bell and the ATEX Group assert that they can only be restored to the status quo ante if Continental indemnifies them for the judgment that the FDIC won against them on the 1983 Guarantees.[12]
 
 
 17
 We review de novo a district court's interpretation of state law. Salve Regina College v. Russell, 111 S.Ct. 1217, 1221 (1991). Downriver Community Federal Credit Union v. Penn Square Bank, 879 F.2d 754, 758 (10th Cir.1989), cert. denied, 493 U.S. 1070 (1990). However, assuming that equitable relief is authorized, a district court has "considerable discretion" in fashioning an appropriate equitable remedy under the circumstances. Stichting Mayflower Recreational Fonds v. Newpark Resources, 917 F.2d 1239, 1245 (10th Cir.1990); see Leathers v. Commercial Nat'l Bank, 410 P.2d 541, 545 (Okla.1966). We therefore will only review an award of equitable relief for an abuse of discretion. Downriver, 879 F.2d at 758; EEOC v. General Lines, Inc., 865 F.2d 1555, 1559 (10th Cir.1989). Applying these standards, we hold that although the Oklahoma statute governing Bell and the ATEX Group's recovery permits equitable relief, the district court did not abuse its discretion in fashioning its remedy.
 
 
 18
 The Oklahoma Securities Act permits both equitable and legal remedies for violations of its provisions. The statute governing remedies for violations of the state's nonregistration law provides that the seller of an unregistered security in violation of 71 U.S.C. 301 is liable:
 
 
 19
 to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at ten percent (10%) per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security....
 
 
 20
 71 Okla.Stat.Ann. 408(a)(2)(A).[13] Section 408(1) explicitly provides that the rights and remedies provided for in Title 71 "are in addition to other rights or remedies that may exist in law or equity."[14] Furthermore, the Oklahoma Supreme Court has observed that "the District Courts of Oklahoma are empowered to do equity in actions brought under the Oklahoma Securities Act." State ex rel. Day v. S.W. Mineral Energy, Inc., 617 P.2d 1334, 1338 (Okla.1980). However, although a trial court is clearly authorized to grant equitable relief under the Oklahoma Securities Act, nothing in the Act or in Oklahoma case law requires a trial court to exercise its equitable powers, much less to exercise it in the way desired by Bell and the ATEX Group.
 
 
 21
 Even if the district court were required under Oklahoma law to exercise its equitable powers, it is clear from its opinion that the court believed that it was doing so--although perhaps not in the manner that Bell and the ATEX would have preferred. The district court observed that 408 permitted it to fashion an equitable remedy, and that it would not be equitable to value Bell and the ATEX Group's guarantees at the face amount of the new debt they guaranteed, while ignoring the value of the collateral. It thus concluded that "[t]he most equitable value of the guarantees in this case is the amount of the new debt undertaken, less the value of the collateral used to secure the debt." Id. Later in the opinion, the court repeated its conclusion, stating that "[t]he measure of damages, determined in light of the court's goal of achieving equity ... is the amount of new debt undertaken, reduced by the amount of collateral securing the debt." D.C.Op. 6-7, reprinted in Aplt.App. 779-80. We cannot say that the district court's exercise of its equitable power to choose this damages formula was an abuse of discretion.
 
 
 22
 Indeed, forcing Continental to indemnify Bell and the ATEX Group for the entire judgment against them would be inequitable in light of Bell and the ATEX Group's responsibility for much of the shortfall in the collateral securing the debt. "It is a fundamental principle of equity jurisprudence that He who comes into equity must come with clean hands.' " Leathers v. Commercial Nat'l Bank, 410 P.2d 541, 546 (Okla.1966). "Equity will not lend its aid to one seeking its active interposition, who has been guilty of unlawful or inequitable conduct in the matter with relation to which he seeks relief." Id. (citations and quotations omitted).
 
 
 23
 Bell and the ATEX Group were arguably responsible for perhaps $20 million of the collateral shortfall on the guaranteed debt, as they (1) took $4.1 million in gas from ORC without paying for it, (2) decreased cash on hand at ORC from $8 million on April 12, 1983 to zero on the date that ORC filed for bankruptcy, and (3) restructured ORC's revolving debt to the Banks so that $8 million could be borrowed without a showing of current assets as collateral (previously, current assets had to exceed ORC's revolving and letter-of-credit debt). Moreover, because they were 100 percent owners of ORC, Bell and the ATEX Group may be considered responsible for the remainder of the collateral shortfall because they chose to continue operating ORC and to risk a drop in the collateral value rather than to liquidate it and use the collateral to pay off the guaranties. That is, at the time that Bell and the ATEX Group executed the 1983 Guaranties, the debt they guaranteed was fully secured. As Bell testified, he and the ATEX Group could have shut down and liquidated ORC the day after he and the ATEX Group purchased it, and paid off the guaranties. Id. However, they chose to continue operating and risk the possibility that the value of the collateral might decrease. It would be inequitable now to permit Bell and the ATEX Group to shift that risk onto Continental. Given that Bell and the ATEX Group were responsible for most of the collateral shortfall, the fact that they had to pay the FDIC on the 1983 Guaranties is largely attributable to their own actions. Consequently, we cannot say that the district court's formula for assessing Bell and the ATEX Group's relief was inequitable.
 
 
 24
 2. WHETHER THE DISTRICT COURT PROPERLY APPLIED THE DAMAGE FORMULA
 
 
 25
 Bell and the ATEX Group next assert that even if we find that the district court correctly decided to measure their damages by reference to the consideration they paid at the time of the securities transaction, the court nevertheless incorrectly applied the formula to the facts of this case. Under the formula applied by the district court, Bell and the ATEX Group were entitled to recover the consideration they paid for the securities, plus interest, costs, and attorneys fees and less any income they received on the securities. At trial, both sides agreed that the only consideration paid by Bell and the ATEX Group were the 1983 Guaranties and the Assumption Agreement; however, questions arose as to how to value the 1983 Guaranties and what types of debts the Assumption Agreement encompassed. On appeal, Bell and the ATEX Group argue that (1) the district court improperly included the value of the ORC collateral securing the debt that they guaranteed in its calculation of the value of the guaranties, and (2) the district court failed to include in its valuation of the consideration $25 million in nonbank debt that they assert was assumed under the Assumption Agreement. We will address each contention in turn.
 
 A. Inclusion of the ORC collateral
 
 26
 Bell and the ATEX Group first assert that the district court improperly calculated the value of part of the consideration they paid for the securities--the 1983 Guarantees--by calculating it in reference to the value of the collateral securing the debt. More specifically, the district court concluded that the value of the 1983 Guaranties consisted of the amount of new debt that they guaranteed, minus the value of the ORC collateral securing the debt at the time of the transaction. Because the court found that the value of the collateral exceeded the amount of the new debt, it concluded that the value of the 1983 Guaranties was zero at the time of the transaction. Bell and the ATEX Group contend it was error to take into account the value of the collateral in valuing the guaranties for three reasons: (1) in doing so, the district court essentially used the value of the stock received by Bell and the ATEX Group to determine the value of the guarantees; (2) Bell and the ATEX Group had no right to reimbursement from ORC's assets in the event they were called to pay on a guaranty; and (3) the proper value of the guarantees is the face value of the guaranties.
 
 1. Use of stock value to value guarantees
 
 27
 First, Bell and the ATEX Group contend that the district court's method for valuing the 1983 Guarantees was, in reality, a rough valuation of the securities sold. They point out that all of ORC's liabilities to the Banks were secured by virtually all of ORC's assets; thus, they contend, subtracting the value of ORC's assets as of April 12, 1983 from ORC's liabilities approximates the "book value" of the securities. They contend that this was error, as the district court was supposed to determine the value of what they gave in consideration, not the value of the securities they received, in determining their relief. Cf. Wigand v. Flo-tek, Inc., 609 F.2d 1028, 1036 (2d Cir.1979) (stating that "[t]he value of the stock itself is irrelevant insofar as relief under section 12(2) [of the Securities Act of 1933] is concerned") We disagree with this analysis on several different levels.
 
 
 28
 It is clear that the district court was not calculating the book value of the stock. For example, the district court considered only the ORC's obligations to the Banks and not ORC's nonbank debts, which was approximately another $25 million. In addition, the court made no effort to consider the speculative value of the stock or to consider all the factors that might add or subtract from the net asset value in determining stock value. Regardless of whether the stock value and the value of the consideration paid by Bell and ATEX were similar or not, the fact remains that the district court's formula was directed at determining the consideration paid and not the stock value.
 
 2. Guarantors' access to ORC collateral
 
 29
 Bell and the ATEX Group next contend that the district court erred in including the collateral in its calculation of the value of the guaranties because they had no rights to ORC's assets in the event their guaranties were called. We find this argument to be without merit.
 
 
 30
 Oklahoma law explicitly provides a guarantor the right to reimbursement from the debtor for any payments made as a surety. 15 Okla.Stat.Ann. 382.[15] The 1983 Guaranties required that before ORC could reimburse Bell and the ATEX Group for payments made on the guaranties, ORC's debts to the Banks must first have been paid in full.[16] However, this requirement does not mean that the guarantors were never entitled to reimbursement from the collateral nor that the assets of ORC could not be used to pay off the bank debt. Because the collateral potentially reduced Bell and the ATEX Group's liability to the Banks, we cannot conclude that the district court erred in calculating the value of the 1983 Guaranties by reference to the value of the collateral.[17]
 
 
 31
 The cases cited by Bell and the ATEX Group in support of their position are inapposite. These cases merely state that a guarantor may not decline to pay an obligation under a continuing guaranty merely because the value of the collateral was impaired, see First City Bank, N.A. v. Air Capitol Aircraft Sales, Inc., 820 F.2d 1127, 1133-34 (10th Cir.1987), or that the creditor need not sue the principal before suing the guarantor, Riverside Nat'l Bank v. Manolakis, 613 P.2d 438, 440-41 (Okla.1980).
 
 3. Face value of guaranties
 
 32
 Bell and the ATEX Group next argue that the district court should have set the value of the guaranties at their full face value. We disagree.
 
 
 33
 A guaranty is only a contingent liability. Whether the liability will materialize depends upon whether the debtor will be able to pay the liability secured by the guaranty. Accordingly, the value of the guaranty is not determined solely by its face value, but instead is a function of the debtor's assets, the likelihood that the guaranty will be called, and the guarantor's ability to pay it if it is called.
 
 
 34
 The notion that the value of a guaranty is not equivalent to its face value was recognized in In re Xonics Photochemical, Inc., 841 F.2d 198 (7th Cir.1988). In dicta, the Xonics court noted that it was improper to consider a corporation to be insolvent for purposes of whether a particular transfer was a preference under the bankruptcy code, where the face value of the corporation's guaranties exceeded its assets. Id. at 199. The court reasoned that to value a contingent liability, such as a guaranty, it is necessary to discount it by the probability that the contingency would occur and the liability would materialize. Id. at 200; see Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.), 904 F.2d 588, 594 (11th Cir.1989) (citing Xonics, 841 F.2d at 200); Sierra Steel, Inc. v. Totten Tubes (In re Sierra Steel, Inc.), 96 B.R. 275, 279 (Bankr. 9th Cir.1989) (citing Xonics, 841 F.2d at 200). Thus, the court concluded that the value of the guaranty in issue was not equal to its face value. See id. Xonics and its progeny suggest that the district court did not err in refusing to set the value of the 1983 Guaranties at their face value.
 
 
 35
 Moreover, we reject Bell and the ATEX Group's argument that refusing to set the value of the guaranties at their face value was inequitable because it did not place them in the position they occupied before the buy out transaction took place. As in Part I, we believe it would be inequitable to give Bell and the ATEX Group the benefit of the full face value of the guaranties, when they are largely responsible for the collateral shortfall that rendered them liable for most of ORC's debts to the Banks.
 
 
 36
 B. The district court's refusal to include nonbank debt
 
 
 37
 Bell and the ATEX Group next contend that the district court erred in calculating the value of the 1983 Guaranties because the court failed to consider $25 million in nonbank debt that they assert they assumed in the Assumption Agreement. We agree with the district court's finding that the Assumption Agreement did not encompass the nonbank debt.[18]
 
 
 38
 The district court properly interpreted the Assumption Agreements, which plainly stated that the obligations assumed by the promisors under the Assumption Agreement were the personal obligations owed by the indemnified parties, and not all debts owed by ORC as urged by Bell and the ATEX Group. The relevant provision of the Assumption Agreement states:
 
 
 39
 Each of the indemnitors [ATEX Tx., ATEX Stations, and Bell] jointly and severally, hereby assume and agree to pay, perform, fulfill and discharge, and to indemnify and hold harmless each of the Indemnified Parties [An-Son Corp., An-Son Transportation Co., and Carl Anderson], including the officers, directors and stockholders of any corporation included therein, from and against any and all liabilities, obligations, claims, losses, damages, costs or expenses of any kind or character of Oklahoma Refining Company ("ORC"), an Oklahoma general partnership....
 
 
 40
 Aplt.App. 944. Under Oklahoma law, the interpretation of an unambiguous contract is a matter of law, Cook v. Oklahoma Bd. of Public Affairs, 736 P.2d 140, 145 (Okla.1987), as is the question of whether a contract is ambiguous, Ferrell Constr. Co. v. Russell Creek Coal Co., 645 P.2d 1005, 1007 (Okla.1982). The terms of an unambiguous contract are to be accepted in their plain and ordinary sense. Dodson v. St. Paul Ins. Co., 812 P.2d 372, 376 (Okla.1991). After considering the punctuation and syntex of this language, we believe it unambiguously states that the indemnitors agree to assume the liabilities of the indemnified parties that relate to ORC. The only ORC-related liabilities that the indemnified parties had were the guaranties that they executed in 1980 guarantying 66 percent of ORC's debt to the Banks.[19] We therefore cannot say that the district court erred in holding that the Assumption Agreement encompassed only the An-Son parties' liabilities relating to ORC's bank debt.
 
 3. ATTORNEYS' FEES
 
 41
 In a cross-appeal, Continental contends that Bell and the ATEX Group should not be awarded attorneys fees if they are not awarded any monetary relief. Section 408(a)(2) provides that the purchaser of securities that violate the nonregistration provision of 301 may sue for, among other things, attorneys fees. Additionally, 408(i) provides that "[a]ny plaintiff who prevails in an action brought under [408(a)(1) or (a)(2) or 408(c)(1) or (c)(2) ] may recover his reasonable attorneys' fees and costs in the action from the defendant." Continental contends that if we affirm the district court's take-nothing judgment in favor of Bell and the ATEX Group, Bell and the ATEX Group cannot be considered prevailing parties within the meaning of 408(i). Although Continental raises this issue, it also suggests that this issue may not properly be before us because the district court did not include it in its partial final judgment. We agree.
 
 
 42
 The partial final judgment determined that Bell and the ATEX Group were prevailing parties entitled to attorney's fees; however, the court deferred a determination of the amount of attorney's fees to be awarded. We have held that an order awarding attorney's fees is not final until the amount of the fees is determined. Pennsylvania Nat'l Mutual Casualty Insurance Co. v. City of Pittsburg, Kansas, 987 F.2d 1516 (10th Cir.1993); Phelps v. Washburn University of Topeka, 807 F.2d 153, 154 (10th Cir.1986). If an order is not, in fact, a final order disposing of a claim, then it cannot properly be certified under R.R.C.P. 54(b) as final. Strey v. Hunt International Resources Corp., 696 F.2d 87, 88 (10th Cir.1982); Wheeler Machinery v. Mountain States Mineral Enterprises, Inc., 696 F.2d 787, 789 (10th Cir.1983).
 
 
 43
 Although it is not entirely clear whether the district did or did not intend to certify the ruling that Bell and the ATEX Group were prevailing parties entitled to attorney's fees, it is clear that such a certification would be ineffective on the record because the amount of the attorney's fees has not yet been established. Accordingly, we lack jurisdiction to consider that issue on this appeal.
 
 
 44
 AFFIRMED.
 
 
 
 [1]
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [2]
 Although ATEX N.M. is now known as ATC Realty Company, we will refer to it by its former name
 
 
 [3]
 Although ATEX Tx. is now known as ATB Realty Company, we will refer to it by its former name
 
 
 [4]
 The designated entities named as the general partners in the partnership agreement were ATEX Rf. and An-Son Refining Company. For ease of reference, we will refer to the general partners in ORC as the ATEX Group and An-Son
 
 
 [5]
 Continental Bank, N.A., was formerly known as Continental Illinois National Bank and Trust Company of Chicago ("Continental Illinois")
 
 
 [6]
 The designated entity purchasing the stock was Atex Stations, Inc
 
 
 [7]
 In addition, An-Son Transportation Company sold 100 percent of the stock of An-Son Pipeline Company to the ATEX Group. An-Son Pipeline Company was the majority partner of Oklahoma Pipeline Company ("OPC"), which was the entity that owned the pipeline gathering system used by ORC. As in the ORC transaction, the designated entity purchasing the OPC stock was ATEX Stations, Inc
 
 
 [8]
 Bell and ATEX Oil Company increased their guaranties from 34 percent to 100 percent. ATEX Tx. and ATEX Rf. became 100 percent guarantors for the first time
 
 
 [9]
 The district court noted that Bell and the ATEX Group objected to this standard and granted them a continuing objection
 
 
 [10]
 Because Bell and ATEX N.M. had already guaranteed 34 percent of ORC's debt in 1980, the new debt assumed under the 1983 Guaranties was much less than $51,638,265, ORC's total indebtedness to the Banks. However, it was unnecessary for the district court to calculate what percentage of the $51 million figure was new debt guaranteed for the first time in 1983, as any smaller figure would yield the same result--a figure less than zero
 
 
 [11]
 The district court also found that the income received by Bell and the ATEX Group was $4,142,136.08. However, given the court's conclusion that the value of the consideration paid was zero, it could not further reduce their recovery by the income they received
 
 
 [12]
 We reject Continental's contention that Bell and the ATEX Group did not raise this argument before the trial court. While Bell and the ATEX Group may not have used the term "indemnity" in challenging the district court's formula for calculating damages, it consistently maintained that the appropriate remedy under 408 would be the functional equivalent of cancelling the liabilities they incurred as a result of the securities transaction. In addition, the district court recognized that Bell and the ATEX Group disagreed with its calculation method
 
 
 [13]
 This provision was formerly codified as 71 Okla.Stat.Ann. 408(a)(1)(i). We will refer to the current codification
 
 
 [14]
 This provision was previously codified as 71 Okla.Stat.Ann. 408(i). We will refer to the current codification
 
 
 [15]
 Section 382 provides:
 A surety upon satisfying the obligations of the principal is entitled to enforce every remedy which the creditor then has against the principal to the extent of reimbursing what he has expended.
 Under Oklahoma law, there is no distinction between a suretyship and a guaranty. Lum v. Lee Way Motor Freight, Inc., 757 P.2d 810, 817 n. 25 (Okla.1987) (citations omitted).
 
 
 [16]
 The 1983 Guaranties provide:
 Performance by the Guarantor hereunder will not entitle the Guarantor to any payment by the Borrower under a claim for contribution, indemnification, subrogation or otherwise, until such time as the Borrower shall have paid in full all amounts owing to the Banks and shall have performed all of the Borrower's Obligations under the Loan Documents.
 Tr. 872 (ATEX N.M); 877 (ATEX Tx.); 882 (ATEX Rf.).
 
 
 [17]
 We do not believe that Paragraph 2(c) of the 1983 Guaranties, which permitted the Banks to release ORC's collateral without changing the guarantors' obligation, requires a different result. As we noted in Part I, the district court did not err in measuring the value of the guaranties as of the time of the transaction, and at the time of the transaction, none of the collateral had been released. Moreover, Bell and the ATEX Group do not even allege that the Banks in fact released any of the collateral securing the loans. We therefore cannot conclude that it was inequitable to include the value of the collateral in the calculation of the guaranties' value, despite the collateral release provision in the guaranties
 
 
 [18]
 The district court also rejected Bell and the ATEX Group's argument regarding the assumption of the nonbank debt on the alternative ground that they failed timely to raise it. We find it unnecessary to consider whether Bell and the ATEX Group waived this argument because we find on the merits that the Assumption Agreements clearly did not encompass the nonbank debt
 
 
 [19]
 There were two versions of the Assumption Agreement before the district court. The version quoted in the text was offered by Continental and was found by the district court to be the "true" version. Aplt.App. 783. We accept that finding, and thus the indemnified parties are limited to those listed therein