In the Matter of XONICS PHOTO-CHEMICAL, INC., Debtor.

Appeal of MITSUI AND COMPANY (U.S.A.), INC.

No. 87–2143.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 6, 1988.

Decided March 8, 1988.

Thomas D. Goldberg, Hughes Hubbard & Reed, Washington, D.C., for appellant.

Erick S. Rein, Schwartz, Cooper, Kolb & Gaynor, Chtd., Chicago, Ill., for appellee.

Before POSNER, COFFEY, and EASTERBROOK, Circuit Judges.

POSNER, Circuit Judge.

This bankruptcy case presents interesting questions concerning the status in bankruptcy of contingent liabilities and interaffiliate obligations. For background see Comment, *Avoidability of Intercorporate Guarantees Under Sections 548(a)(2) and 544(b) of the Bankruptcy Code*, 64 N.C.L.Rev. 1099 (1986). Xonics, Inc., now in Chapter 11 bankruptcy, has several wholly owned subsidiaries that are engaged in making medical equipment. The largest is Xonics Medical Systems, Inc.; one of the smallest is Xonics Photochemical, Inc., the debtor in the proceeding before us. In 1982 and 1983, a time of prosperity for the Xonics family, Xonics Medical Systems borrowed some $15 to $20 million from a bank, on a $25 million credit line. Xonics, Inc., the parent, caused Xonics Photochemical, Inc. (along with the other subsidiaries) to guarantee the loan; at the time Xonics Photochemical had gross assets of some $2.6 million and net assets of $1.7 million. Xonics, Inc. also caused Xonics Photochemical to become a co-maker with Xonics Medical Systems of a note to secure an additional loan of $3 million.

Shortly after these transactions, Mitsui & Co. (U.S.A.), Inc., a supplier to Xonics Photochemical, shipped it some chemicals, and invoiced it for the purchase price, which was (approximately) $124,000. Xonics Photochemical paid the invoice with two checks that cleared in January 1984. Fewer than 90 days later, Xonics Photochemical was in bankruptcy. Xonics Medical Systems had defaulted on its bank loan, triggering the guarantees of its affiliates. The total assets of the Xonics family—all of which were pledged to the creditors of each member through guarantees similar to the one Xonics Photochemical had signed—were short of the total liabilities by many millions of dollars; so all the subsidiaries, as well as the parent, found themselves in Chapter 11.

Xonics Photochemical, as debtor in possession (no trustee in bankruptcy had been appointed), brought an adversary proceeding against Mitsui to set aside the two payments as preferences voidable under 11 U.S.C. § 547(b). This provision makes transactions voidable by the trustee, but 11 U.S.C. § 1107(a) gives the debtor in possession the powers of a trustee. The dispositive issue was whether Xonics Photochemical had been insolvent when the payments to Mitsui were made; that is, did the fair value of its liabilities exceed the fair value of its assets (11 U.S.C. § 101(31)(A))? If so, the payments were indeed voidable preferences, see 11 U.S.C. § 547(b)(3), since the other conditions in section 547(b) had been met. The bankruptcy judge and the district judge thought Xonics Photochemical had been insolvent then; Mitsui disagrees and has appealed.

█ The startling feature of the case is the parties' apparent assent to the proposition that if the loan guarantee and the note that Xonics Photochemical had co-signed were valid obligations, Xonics Photochemical was insolvent as of the date the obligations were assumed, on the theory that they created liabilities greater than the company's net assets (much greater: $28 million in liabilities versus less than $2 million in net assets). The proposition is absurd; it would mean that every individual or firm that had contingent liabilities greater than his or its net assets was insolvent—something no one believes. Every firm that is being sued or that may be sued, every individual who has signed an accommodation note, every bank that has issued a letter of credit, has a contingent liability. Such liabilities are occasionally

listed on the firm's balance sheet, for example by earmarking a portion of surplus for contingent liabilities. (They are supposed to be listed "if the future event is *likely to occur* and if its amount can be *reasonably estimated.*" Nikolai et al., Intermediate Accounting 611 (3d ed. 1985) (emphasis in original).) More often they are listed in a footnote, thus leaving the firm's stated net worth undisturbed. Often they are not listed at all, when they are remote or when they are too small to affect net worth substantially. On the proper accounting treatment of contingent liabilities see *id.* at 610–14; Faris, Accounting for Lawyers 362–64 (3d ed. 1975); Williams, Stanga & Holder, Intermediate Accounting 609–17 (1984); Meigs, Mosich & Johnson, Accounting: The Basis for Business Decisions 288 (3d ed. 1972); Financial Accounting Standards Board, FASB Statement of Standards No. 5 (1975).

There is a compelling reason not to value contingent liabilities on the balance sheet at their face amounts, even if that would be possible to do because the liability, despite being contingent, is for a specified amount (that is, even if there is no uncertainty about what the firm will owe *if* the contingency materializes). By definition, a contingent liability is not certain—and often is highly unlikely—ever to become an actual liability. To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real. Suppose that on the date the obligations were assumed there was a 1 percent chance that Xonics Photochemical would ever be called on to yield up its assets to creditors of Xonics Medical Systems (or other members of the Xonics family, since the system of guarantees had the effect of pooling their assets for the benefit of creditors of any member). Then the true measure of the liability created by these obligations on the date they were assumed would not be $28 million; it would be a paltry $17,000. For at worst Xonics Photochemical would have to yield up all of its assets (net of other liabilities), that is, $1.7 million, and the probability of this outcome is by assumption only 1 percent (we are ignoring intermediate possibil-

ities—e.g., that Xonics Photochemical would be forced to cough up $1 million rather than $1.7 million). Discounted, the obligations would not make Xonics insolvent, and section 547(b) would not come into play unless events occurring between the assumption of the obligations in 1982 and 1983 and the bankruptcy in 1984 had altered the picture. We add that Xonics Photochemical did not in fact list these obligations as liabilities on its balance sheet.

The principle just outlined has long been recognized in cases dealing with the question whether a firm is insolvent within the meaning of the Bankruptcy Code (and this is such a case). It makes no difference whether the firm has a contingent asset or a contingent liability; the asset or liability must be reduced to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities. See, e.g., *Syracuse Engineering Co. v. Haight*, 97 F.2d 573, 576 (2d Cir.1938) (L. Hand, J.); *In re Ollag Construction Equipment Corp.*, 578 F.2d 904, 909 (2d Cir.1978); *In re Fulghum Construction Co.*, 7 B.R. 629, 632–33 (Bankr.M.D.Tenn. 1980), aff'd, 14 B.R. 293 (M.D.Tenn.1981); *In re Hemphill*, 18 B.R. 38, 48–49 (Bankr. S.D.Iowa 1982). The criticism of this position in the student Comment cited earlier, 64 N.C.L.Rev. at 1118–19, is perfunctory and unpersuasive.

Occasionally one finds the flat statement that "contingent or inchoate claims of the bankrupt are not included as part of the bankrupt's property." *Allegaert v. Chemical Bank*, 418 F.Supp. 690, 692 (E.D.N.Y. 1976). This is the equally untenable opposite extreme from valuing them at their face amount. But the quoted language appears to be loose; what these cases actually mean is that if, but for a contingent claim unlikely to yield any cash in the near future, the firm would be deemed insolvent, the existence of a faint hope—cold comfort for creditors waiting to be paid— will not save it from bankruptcy. See *Penn v. Grant*, 244 F.2d 309 (9th Cir.1957) (per curiam); *In re Bichel Optical Laboratories, Inc.*, 299 F.Supp. 545 (D.Minn.1969).

No more should the existence of remote contingencies, which do not seriously endanger the firm's ability to pay its debts, be deemed to make an otherwise solvent firm bankrupt. See *In re Waters*, 8 B.R. 163, 166 (Bankr.N.D.Ga.1981).

We have gone into this non-issue at such length only to avoid creating the unsettling impression that contingent liabilities must for purposes of determining solvency be treated as definite liabilities even though the contingency has not occurred. Mitsui has chosen not to make an issue of the contingent nature of the guarantee and of the co-signature of the note; maybe Xonics Medical Systems was really insolvent by the time Mitsui received the payments in issue from Xonics Photochemical, so that the contingent liability was no longer contingent. The only argument Mitsui makes against the finding that the payments to it were voidable preferences is that Xonics Photochemical was not insolvent when they were made because the transactions between it and its affiliates were (1) void under state law (the parties agree that the applicable state law is that of Illinois), or (2) voidable as fraudulent conveyances. If either contention is correct, the transactions created no liabilities on the part of Xonics Photochemical and therefore could not have made it insolvent, whatever the plight of Xonics Medical Systems; hence section 547(b) would not be triggered.

■ 1. When a parent causes one of its subsidiaries to guarantee another's (or the parent's own) debts, there is an obvious danger—one indeed that has materialized in this case—that creditors of the guarantor, who normally are unaware of the contingent liability and may not even be aware of their debtor's affiliation with other corporations, will find themselves, without warning, dealing with a suddenly less solvent (not, as we have been at pains to stress, necessarily insolvent) debtor. The effect of the guarantee, especially where as here it is a part of a network of guarantees that have the effect of making the debts of each affiliate debts of all the other affiliates as well, is similar to that of a rule of law that treats the assets of affiliated corporations as a common pool available to the creditors of each affiliate. Such rules have sometimes been advocated, but the law has refused to adopt them, for just the reason stated; they make it harder for creditors of an affiliated corporation to assess their debtor's creditworthiness. If such rules were in force, "a sign of weakness in any member of a family of corporations would lead creditors to descend on each member, strong or weak, to claim their pound of flesh." *In re Auto–Train Corp., Inc.*, 810 F.2d 270, 277 (D.C.Cir. 1987). Hence there is no automatic "piercing of the corporate veil" in affiliation settings. The assets of affiliated corporations are not treated as a common pool available to the creditors of each affiliate unless unusual circumstances are present that would make it inequitable to allow the other affiliates to set up the principle of limited liability, the clearest such circumstance being that the creditors of all the affiliates had thought they were dealing with a unitary enterprise. For a thorough discussion see *Cissell v. First Nat'l Bank of Cincinnati*, 476 F.Supp. 474, 479–81 (S.D.Ohio 1979); see also *Main Bank of Chicago v. Baker*, 86 Ill.2d 188, 204–06, 56 Ill.Dec. 14, 427 N.E.2d 94, 101–02 (1981); *Van Dorn Co. v. Future Chemical & Oil Corp.*, 753 F.2d 565, 569–70 (7th Cir.1985) (applying Illinois law); cf. *In re Kaiser*, 791 F.2d 73, 75 (7th Cir.1986).

■ But here the pooling was accomplished voluntarily, so the focus of analysis switches to the question whether the policy behind generally not piercing the corporate veil precludes ever enforcing a guarantee by one affiliate of another's debts. Courts have not thought so; a guarantee of an affiliate's debt is enforceable (see *Telefest, Inc. v. Vu–TV, Inc.*, 591 F.Supp. 1368, 1377–81 (D.N.J.1984), and cases cited there) provided that the guarantor derives some benefit, even if indirect, see *id.* at 1379, from the guarantee. The benefit operates as a partial offset to the impairment in the prospects of the guarantor's creditors resulting from the debtor's assuming a contingent liability.

■ Whether Xonics Photochemical derived a benefit from its guarantees was a factual question, and we cannot say that the bankruptcy judge's resolution of it was clearly erroneous. Although the primary benefit of the loan accrued to the borrower, Xonics Medical Systems, that company's fortunes were entwined with those of Xonics Photochemical because the smaller company used its larger affiliate's distribution system to distribute its own products. The benefit may not have been great but neither was the cost. Xonics Photochemical was not paying any interest on the loan; it just was a guarantor, and all concerned assumed that the loan would be duly repaid and no guarantor would be out of pocket. The co-signed note was to secure a line of credit on which Xonics Photochemical as well as Xonics Medical Systems could draw; so again there was benefit.

2. Mitsui's second ground for invalidating the interaffiliate transactions is that they are fraudulent conveyances within the meaning of 11 U.S.C. §§ 544(b) or 548(a). These two provisions (well discussed in the student Comment cited at the beginning of this opinion) must be distinguished. Section 544(b) in effect allows the trustee to use the applicable state's law of fraudulent conveyances to set aside obligations incurred by the bankrupt. The action of a parent corporation in causing one of its wholly owned subsidiaries to guarantee the debts of another could in appropriate circumstances be deemed a fraud on the guarantor's own creditors, even if there was consideration for the guaranty—that is, even if the guarantor obtained *some* benefit from the transaction—so that it would not fail under ordinary contract law. Cf. *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 993 (2d Cir.1981). Nominal consideration is, in general, all that is needed to satisfy the requirements of the law of contracts (see 2 Blackstone, Commentaries on the Laws of England 440 (1766) ("peppercorn"); Farnsworth, Contracts §§ 2.11–.14 (1982))—a requirement of adequate or commensurate consideration would gravely undermine freedom of contract—but a conveyance not supported by adequate consideration is "fraudulent"

(that is, unenforceable) as against existing creditors of a debtor who gave up value in exchange for the inadequate consideration. See *King v. Ionization International, Inc.*, 825 F.2d 1180, 1186 (7th Cir.1987). And, even if the consideration is adequate, the conveyance is fraudulent if made with intent to defraud creditors. See *id.*

Section 548(a) creates an alternative, federal concept of fraudulent conveyances—or rather two alternative federal concepts. If an obligation was incurred within one year before the filing of the petition for bankruptcy, and there was actual intent to defraud either an existing or a future creditor, the trustee can avoid the obligation. 11 U.S.C. § 548(a)(1). Alternatively, if the debtor "received less than a reasonably equivalent value in exchange for such ... obligation" and was insolvent on the date the obligation was incurred, the trustee again can avoid the obligation. 11 U.S.C. § 548(a)(2).

■ We shall not have to decide whether the obligations that Xonics Photochemical incurred by virtue of its guarantee of the loan to Xonics Medical Systems and of its becoming a co-maker with XMS of a note are vulnerable under either 544(b) or 548(a). The right to invoke these provisions belongs not to a particular unsecured creditor such as Mitsui but to the trustee (or debtor in possession) as the representative of all the unsecured creditors; and in this case the debtor in possession has not invoked either provision. It is not as if Mitsui itself had been a creditor harmed by the allegedly fraudulent conveyances; they preceded the payments in issue. Mitsui is seeking to stand in the shoes of creditors who may have been harmed, but only the trustee or debtor in possession can do that.

Since there is no trustee and the debtor in possession remains an affiliate of the firm whose debt the debtor had guaranteed, Mitsui is entitled to wonder whether the refusal by the debtor in possession to try to void the guarantee (and perhaps the co-signed note as well) was really made in good faith. But, if so, Mitsui could have sought the appointment of a trustee in bankruptcy, see 11 U.S.C. § 1104, and it

has never done so. Mitsui says it doesn't have enough at stake in this case to warrant bearing the expense of proving the need for the appointment of a trustee; yet it seems willing to supply the very same proof in order to persuade us that it should be allowed to stand in the shoes of the debtor in possession and invoke fraudulent-conveyance law.

 An alternative route possibly open to Mitsui, see *In re Automated Business Systems, Inc.*, 642 F.2d 200 (6th Cir.1981); *In re Jones*, 37 B.R. 969 (Bankr.N.D.Tex. 1984), was to ask the bankruptcy court to allow it to bring a form of derivative suit in the name of the debtor. But before it could do any such thing it would have to convince the court that the debtor was shirking his statutory responsibilities; and this Mitsui has never done. Cf. *Fox Valley AMC/Jeep, Inc. v. AM Credit Corp.*, 836 F.2d 366 (7th Cir.1988), and cases cited there.

In these circumstances a better argument for Mitsui from sections 544(b) and 548(a), but one that Mitsui does not make, is that these provisions supply another reason for writing down the contingent liabilities upon which the finding of Xonics Photochemical's insolvency at the time of the preferential payments was (in part anyway) based. For if by virtue of fraudulent-conveyance law the liabilities might not be enforceable in the event of bankruptcy (depending of course on what a trustee in bankruptcy or debtor in possession might choose to do)—and indeed might be voided in an independent action before bankruptcy—this would be another reason for thinking that these liabilities should be drastically discounted in deciding whether they had made the debtor insolvent, and hence whether the payments to Mitsui are voidable under section 547(b). An unenforceable debt is not much of a liability.

Mitsui has presented no ground on which we are authorized to set aside the voiding of the payments made to it.

AFFIRMED.