**Dudley B. MERKEL; LaDonna K. Merkel; David A. Hepburn, and Nancy J. Hepburn, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

**No. 98–70420.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 11, 1999.

Filed Sept. 17, 1999

Gregory W. MacNabb, Plattner, Schneidman & Schneider, Phoenix, Arizona, for the petitioners-appellants.

Steven W. Parks, United States Department of Justice, Tax Division, Washington D.C., for the respondent-appellee.

Before: O'SCANNLAIN, WARDLAW and FLETCHER, Circuit Judges.

Opinion by Judge WARDLAW; Dissent by Judge O'SCANNLAIN.

WARDLAW, Circuit Judge:

This case calls upon us to decide the standard for determining when a contingent obligation to pay is a "liability" for purposes of determining insolvency under 26 U.S.C. § 108(d)(3).

Appellants Dudley and La Donna Merkel and David and Nancy Hepburn ("Appellants") appeal from the Tax Court's decision sustaining determinations of income tax deficiency for the tax year 1991 made by the Commissioner of Internal Revenue ("Commissioner"). The Tax Court found that Appellants failed to prove that as of the measurement date it was likely they "would be called upon to pay" a claimed liability, and thus Appellants' total liabilities did not exceed the fair market value of their assets. Accordingly, the Tax Court found that Appellants were not insolvent under § 108(d)(3) and therefore could not exclude discharge of indebtedness income under the insolvency exclusion set forth in 26 U.S.C. § 108(a)(1)(B). We have jurisdiction pursuant to 26 U.S.C. § 7482, and we affirm.

## I

For the most part, the facts of this case are undisputed. During the taxable year 1991, Appellants were general partners in HMH Partners ("HMH"). The Merkels and Hepburns each owned twenty-five percent of HMH, and a third party owned the remaining fifty percent. On September 1, 1991, Great Western Bank granted forgiveness to HMH on a $1,439,000 nonrecourse note. As a result, as twenty-five percent partners, the Merkels and Hepburns each received $359,721 of discharge of indebtedness as distributable income.[1] Appellants reported this debt discharge in their 1991 income tax returns. They excluded it from income, however, under 26 U.S.C. § 108(a)(1)(B) based upon their claimed insolvency.[2]

On March 24, 1995, the Commissioner mailed notices of deficiency pursuant to 26 U.S.C. § 6212 to the Merkels and Hepburns, indicating that for the taxable year 1991, each couple's federal income tax was deficient in the amounts of $115,420 and $116,347, respectively. On June 12, 1995, the Merkels and Hepburns filed petitions in the United States Tax Court challenging the Commissioner's determinations of deficiency. The Tax Court granted the Commissioner's motion to consolidate the cases.

The parties stipulated that the issue before the Tax Court was whether Appellants were insolvent within the meaning of 26 U.S.C. § 108(d)(3) immediately before the forgiveness of the note by Great Western Bank on September 1, 1991. Section 108(d)(3) defines "insolvent" as "the excess of liabilities over the fair market value of assets."[3] To determine whether Appellants were insolvent under the statute, the Tax Court had to decide whether Appellants' guaranty on a loan was a § 108(d)(3) "liability" as of August 31, 1991.[4] If the guaranty was a liability, Appellants were insolvent and the debt discharge was properly excludable from gross income under 108(a)(1)(B).

---

**1.** Gross income means all income from whatever source derived, including income from discharge of indebtedness. *See* 26 U.S.C. § 61(a)(12).

**2.** Section 108(a)(1) provides: "Gross income does not include any amount which ... would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if ... the discharge occurs when the taxpayer is insolvent...." 26 U.S.C. § 108(a)(1)(B).

**3.** Section 108(d)(3) provides: "For purposes of this section, the term 'insolvent' means the excess of liabilities over the fair market value of assets. With respect to any discharge, whether or not the taxpayer is insolvent, shall be determined on the basis of the taxpayer's assets and liabilities immediately before the discharge." 26 U.S.C. § 108(d)(3).

**4.** The Tax Court found that Appellants failed to prove their allegation that certain state tax obligations were "liabilities" under § 108(d)(3). Appellants do not contest this finding on appeal.

Appellants personally had guaranteed a loan made in 1986 by Security Pacific Bank (the "Bank") to Systems Leasing Corporation ("SLC"), a computer leasing business of which the Merkels and Hepburns each owned half.[5] SLC was the sole maker of the note evidencing the debt to the Bank. Appellants personally guaranteed the SLC note pursuant to a document entitled "Continuing Guaranty (and Security Agreement)" (the "Guaranty"). As of April 16, 1991, the unpaid balance of the SLC note exceeded $3,100,000, and SLC was in default of its note obligations. At no time did the Bank make any formal written demand for payment from Appellants pursuant to the Guaranty.

On May 31, 1991, SLC, the Bank and Appellants, as guarantors, entered into a structured workout agreement (the "Letter Agreement") concerning the repayment of the indebtedness to the Bank. Under the Letter Agreement: (1) SLC agreed to pay the Bank $1,100,000 (the "payoff") on or before August 2, 1991 (the "settlement date"); (2) the Bank agreed to release its security interests in the remaining collateral upon payment of the payoff by the settlement date; and (3) after payment of the payoff by the settlement date, the Bank would refrain from exercising any remedies under the SLC note or the Guaranty if bankruptcy were not filed by or for SLC or the Merkels or Hepburns, among others, voluntarily or involuntarily, within 400 days after the settlement date (a "bankruptcy event").

SLC paid $1,100,000 to the Bank by the settlement date as called for under the Letter Agreement, and the Bank thereafter released its security interests in. the remaining collateral of SLC. No bankruptcy petition was filed with respect to SLC, the Merkels or Hepburns, or any other persons or entities relevant to the Letter Agreement as of August 31, 1991.[6]

The Commissioner argued before the Tax Court that Appellants' obligation under the Guaranty was not a liability for purposes of calculating insolvency under § 108(d)(3) because the term "liabilities" encompasses only obligations to pay that are ripe and in existence immediately before the discharge of indebtedness. In sustaining the Commissioner's determinations of income tax deficiency, the Tax Court took a different tack, holding that Appellants failed to prove by a preponderance of the evidence that as of August 31, 1991 (the measurement date), they "would be called upon to pay" their obligation under the Guaranty, and that therefore, the obligation was not a liability for purposes of calculating insolvency under § 108(d)(3). Accordingly, the Tax Court found that Appellants' total liabilities. so proved did not exceed the fair market value of their assets and held that the discharge of indebtedness income could not be excluded under § 108(a)(1)(B). This appeal followed.

II

We review decisions of the Tax Court on the same basis as we would a decision rendered by a district court in a bench trial. See Estate of Rapp v. Commissioner, 140 F.3d 1211, 1214 (9th Cir. 1998). Its factual findings are reviewed for clear error. See id. That is, we must accept the Tax Court's findings of fact unless we are left with the definite and firm conviction that a mistake has been committed. See Sawyer v. Whitley, 505 U.S. 333, 346 n. 14, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). The Tax Court's conclusions of law and construction of the Internal Revenue Code are reviewed de novo. See Estate of Rapp, 140 F.3d at 1215. Because the Tax Court has special expertise in the field, however, its opinions

---

5. At the time SLC obtained the loan, Security Pacific Bank was known as The Arizona Bank.

6. In fact, no bankruptcy event occurred during the 400-day period, and at the expiration of the 400-day period, the Bank released SLC from its liability as the maker of the SLC note and Appellants from the Guaranty.

bearing on the Internal Revenue Code are "entitled to respect." *Harbor Bancorp & Subsidiaries v. Commissioner,* 115 F.3d 722, 727 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1035, 140 L.Ed.2d 102 (1998).

### III

### A

The parties agree that the determinative issue in this case is whether on August 31, 1991, Appellants' Guaranty was a "liability" for purposes of determining insolvency under § 108(d)(3). In resolving this issue, we must take into account that under the Letter Agreement, Appellants' obligation to pay pursuant to the Guaranty was contingent upon the occurrence of a bankruptcy event.

■ "When interpreting a statute, we ordinarily first look to the plain meaning of the language used by Congress. But if the statute is ambiguous, we consult the legislative history, to the extent that it is of value, to aid in our interpretation." *Moyle v. Director, Office of Workers' Compensation Programs,* 147 F.3d 1116, 1120 (9th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1454, 143 L.Ed.2d 541 (1999) (quoting *Straub v. A.P. Green, Inc.,* 38 F.3d 448, 452 (9th Cir.1994)). "When a statute does not define a term, we generally interpret that term by employing the ordinary, contemporary, and common meaning of the words that Congress used." *United States v. Iverson,* 162 F.3d 1015, 1022 (9th Cir.1998). "If the plain meaning of the statute only supports one interpretation, the statute is not ambiguous." *California v. Montrose Chemical Corp. of California,* 104 F.3d 1507, 1514 (9th Cir.1997). We

are to construe exclusions from gross income narrowly in favor of taxation. *See United States v. Centennial Savs. Bank,* 499 U.S. 573, 583, 111 S.Ct. 1512, 113 L.Ed.2d 608 (1991); *Harbor Bancorp,* 115 F.3d at 732.

In determining whether the Guaranty, as modified by the Letter Agreement, was a liability under § 108(d)(3), we find little guidance from the text and structure of the statute. The term "liabilities" is not defined in the Internal Revenue Code or in any Treasury Regulation. Moreover, § 108(d)(3) does not indicate how likely the occurrence of a contingency must be in order to count the obligation as a liability.

Black's Law Dictionary defines "liability" as a "broad legal term ... including almost every character of hazard or responsibility, absolute, contingent, or likely." *Black's Law Dictionary* 914 (6th ed.1990). Under this definition, the Guaranty could be considered a liability because it is a "responsibility" that is "contingent." But, it is not clear from the statute whether Congress intended for *all* contingent liabilities to be considered in the insolvency calculation under § 108(d)(3). *See* 14 *Mertens Law of Federal Income Taxation* § 54.06 (1998) ("It is not clear whether the taxpayer can take into account contingent liabilities or contested liabilities; however, if a contingent liability is too remote to be reflected in basis, such contingent liability should not be taken into account."). Indeed, in calculating insolvency under § 108(d)(3), inclusion of all contingent liabilities, no matter how remote, could lead to the absurd result of the insolvency exception swallowing the general rule that discharge of indebtedness income be included in gross income.[7]

---

7. Were we to conclude that all contingent liabilities, no matter how remote, are to be counted as liabilities for purposes of determining insolvency under § 108(d)(3), a taxpayer claiming to be insolvent within the meaning of § 108(a)(1)(B) could count as a liability a guarantee on a loan that was also secured by an extremely valuable asset. Although it is possible that this hypothetical

taxpayer would have to pay on the guarantee, the likelihood of this occurring could be so small that inclusion of the guarantee as a liability would be absurd. *See also Whitmire v. Commissioner,* 178 F.3d 1050 (9th Cir. 1999) (involving taxpayer who invested in limited partnership where transaction could have resulted in taxpayer being personally liable for up to 434.75% of his capital contri-

Appellants concede that such a broad construction of the statute is unwarranted. Moreover, we are compelled to construe exclusions from income narrowly. *See Centennial Savs. Bank,* 499 U.S. at 583–84, 111 S.Ct. 1512. Accordingly, because the plain language of the statute does not limit which contingent liabilities, if any, may be counted in calculating insolvency under § 108(d)(3), we are compelled to examine the legislative history of the insolvency exclusion to ascertain Congress' intent. *See United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290, (1989) (explaining that when "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters ... the intention of the drafters, rather than the strict language, controls") (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)).

### B

In 1954, Congress codified the discharge of indebtedness rule announced by the Supreme Court in *United States v. Kirby Lumber Co.,* 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931). *See* 26 U.S.C. § 61(a)(12); *Babin v. Commissioner,* 23 F.3d 1032, 1034 (6th Cir.1994) ("In 1954, Congress codified the ruling in *Kirby Lumber,* specifically providing that gross income includes '[i]ncome from discharge of indebtedness.'"). In *Kirby Lumber,* a corporation issued its own bonds for $12,-126,800 for which it received their par value. During the same year, the corporation purchased some of the same bonds at less than par value. The difference in price was $137,521.30. The Supreme Court concluded that the corporation "realized within the year an accession to income." *Kirby Lumber,* 284 U.S. at 3, 52 S.Ct. 4. The Court reasoned that "[a]s a result of its dealing[, Kirby Lumber] made available $137,521.30 [of] assets previously

bution upon the occurrence of six contingen-

offset by the obligation of bonds now extinct." *Id.*

The reasoning in *Kirby Lumber* has been called the "freeing-of-assets" theory. *See Commissioner v. Tufts,* 461 U.S. 300, 310 n. 11, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983). Under this theory, a taxpayer realizes gain when a debt is discharged because after the discharge the taxpayer has fewer liabilities to offset her assets. The taxpayer's existing assets, which otherwise would have gone toward repaying the debt, are freed.

Congress added the insolvency exclusion to the Internal Revenue Code as part of the Bankruptcy Tax Act of 1980. *See* 26 U.S.C. § 108(a)(1)(B). The § 108(a)(1)(B) exclusion is based on a judicially-developed insolvency exception to the *Kirby Lumber* rule initially set forth in *Dallas Transfer & Terminal Warehouse Co. v. Commissioner,* 70 F.2d 95 (5th Cir.1934). *See* S.Rep. No. 96–1035, at 8 (1980), *reprinted in* 1980 U.S.C.C.A.N. 7017, 7023. In *Dallas Transfer,* the Commissioner determined a deficiency of income tax against the petitioner based upon a discharge of indebtedness which the petitioner received during the relevant tax year. After the Board of Tax Appeals approved the action of the Commissioner, petitioner sought review in the Fifth Circuit. On appeal, the court held that the Commissioner's deficiency determination was erroneous because at the time of the debt discharge, petitioner was insolvent, and that therefore, the cancellation of the past due debt did not have the effect of making the petitioner's assets greater than they were before the discharge. The court distinguished *Kirby Lumber,* explaining:

> This does not result in the debtor acquiring something of exchangeable value in addition to what he had before. There is a reduction or extinguishment of liabilities without any increase of assets. There is an absence of such a gain or profit as is required to come within the accepted definition of income. It

cies).

hardly would be contended that a discharged insolvent or bankrupt receives taxable income in the amount by which his provable debts exceed the value of his surrendered assets.... Taxable income is not acquired by a transaction which does not result in the taxpayer getting or having anything he did not have before. Gain or profit is essential to the existence of taxable income. A transaction whereby nothing of exchangeable value comes to or is received by a taxpayer does not give rise to or create taxable income.

*Dallas Transfer*, 70 F.2d at 96. The Senate Report demonstrates that aside from its acceptance of the freeing of assets theory, Congress intended to ease the tax burden of insolvent debtors in enacting § 108(a)(1)(B):

> The rules of the bill concerning income tax treatment of debt discharge in bankruptcy are intended to accommodate bankruptcy policy and tax policy. To preserve the debtor's 'fresh start' after bankruptcy, the bill provides that no income is recognized by reason of debt discharge in bankruptcy, so that a debtor coming out of bankruptcy (or an insolvent debtor outside bankruptcy) is not burdened with an immediate tax liability.

S.Rep. No. 96–1035, 1980 U.S.C.C.A.N. at 7024; *see also Babin*, 23 F.3d at 1035 (6th Cir.1994) ("The insolvency exception, among other things, is premised on the belief that it is inequitable 'to kick someone when he is down.'") (quoting 1 Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts*, ¶ 6.4.1 at 6–27 (2d ed.1989)).

The origins of § 108(a)(1)(B) demonstrate that Congress intended for only those liabilities in the amount that actually offset assets to be considered in calculating insolvency for purposes of the income tax exclusion. We agree with the Tax Court's conclusion that "an indiscriminate inclusion of obligations to pay ... in the statutory insolvency calculation[ ], without

any consideration of how speculative those obligations may be, would render meaningless any inquiry into whether assets are freed upon the discharge of indebtedness." We also agree, based on Congress' purpose of not burdening an insolvent debtor with an immediate tax liability, that Congress considered a debtor's ability to pay an immediate tax on discharge of indebtedness income the "controlling factor" in determining whether the § 108(a)(1)(B) exception applies. Accordingly, a taxpayer claiming to be insolvent for purposes of § 108(a)(1)(B) and challenging the Commissioner's determination of deficiency must prove by a preponderance of the evidence that he or she will be called upon to pay an obligation claimed to be a liability and that the total amount of liabilities so proved exceed the fair market value of his or her assets.

The dissent urges instead that we adopt a construction of § 108(a)(1)(B) and § 108(d)(3) which would define "liability" as including all liabilities discounted by the probability of their occurrence. We agree with the dissent that as a general proposition "'[d]iscounting a contingent liability by the probability of its occurrence is good economics and therefore good law.'" *Post*, at 854 (quoting *Covey v. Commercial Nat'l Bank*, 960 F.2d 657, 660 (7th Cir. 1992) (construing 11 U.S.C. § 101(32)(A), which defines insolvency for purposes of bankruptcy). As sound as the economic policy outlined by the dissent may be, however, it is not the law Congress enacted when it sought to "accommodate" bankruptcy policy with tax policy. *See* S.Rep. No. 96–1035. Unlike the statutory provision at issue in *Covey*, the definition of insolvency in the Internal Revenue Code expressly requires a fair market valuation of assets only and not liabilities. *See* 26 U.S.C. § 108(d)(3).

The issue in *Covey* was whether a firm was "insolvent" as defined in the Bankruptcy Code. Under the Bankruptcy Code, "'insolvent' means ... with reference to an entity other than a partnership and a

municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32)(A). Relying on its prior ruling in *In re Xonics Photochemical, Inc.*, 841 F.2d 198 (7th Cir. 1988), the Seventh Circuit held: "To decide whether a firm is insolvent ... a court should ask: What would a buyer be willing to pay for the entire package of assets and liabilities? If the price is positive, the firm is solvent; if negative, insolvent." *Covey*, 960 F.2d at 660. The Seventh Circuit's analysis is supported by the plain language of 11 U.S.C. § 101(32)(A), as the phrase "at a fair valuation" may be read to modify both "debts" and "property," and the definition of insolvency encompasses both, as so modified. By contrast, § 108(d)(3) defines insolvency as "the excess of liabilities over the fair market value of assets." Unlike 11 U.S.C. § 101(32)(A), the phrase "fair market value" in § 108(d)(3) modifies "assets" but not "liabilities." That Congress explicitly stated that "assets" under § 108(d)(3) were to be valued at fair market value, and did not state the same as to liabilities, suggests that it did not intend liabilities to be valued at fair market value. Moreover, that Congress explicitly provided under 11 U.S.C. § 101(32)(A) that both "debts" and "property" were to be valued "at a fair valuation" suggests that it knows how to provide for comparable treatment of liabilities and assets when that is what intends to do.[8]

Thus, it is the dissent that departs from the plain meaning of the statute by imbuing it with an economic analysis neither express in the statutory language nor supported by an examination of congressional intent. Indeed, in seeking to import a valuation mechanism in reliance upon five cases from other circuits decided exclusively in the "bankruptcy context," Post, at 853, the dissent fails to recognize, as Congress clearly did, that tax policy is distinct from bankruptcy policy. Two of the decisions cited by the dissent interpret the Bankruptcy Code's definition of insolvency. *See Covey*, 960 F.2d at 660; *In re Xonics Photochemical, Inc.*, 841 F.2d at 200. Another case, also interpreting the definition of insolvency under the Bankruptcy Code, stands for exactly the opposite principle as that attributed to it by the dissent. *See Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 197 (3d Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 1843, 140 L.Ed.2d 1093 (1998) ("We agree with TWA that we must consider the face value of TWA's publicly traded debt rather than the market value."). Finally, the last two cases do not involve calculating insolvency at all. Instead, they stand for the unrelated proposition that contingent liabilities are to be valued at fair market value when applying the test for determining whether a conveyance was fraudulent; *i.e.,* was "reasonably equivalent value" received? *See FDIC v. Bell,* 106 F.3d 258, 263–64 (8th Cir.1997) (determining whether a fraudulent transfer had occurred under the Arkansas Fraudulent Transfer Act, Ark.Code Ann. § 4–59–204); *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.),* 904 F.2d 588, 593 (11th Cir. 1990) (determining whether a fraudulent transfer had occurred under the Bankruptcy Code, 11 U.S.C. § 548).

Having determined that a taxpayer claiming to be insolvent for purposes of § 108(a)(1)(B) and challenging the Commissioner's determination of deficiency must prove by a preponderance of the evidence that he or she will be called upon to pay an obligation claimed to be a liability and that the total amount of liabilities so proved exceed the fair market value of his or her assets, we now address whether

---

8. Although neither party argues on appeal in favor of applying *Covey* in the present context, (indeed, Appellants' counsel expressly disavowed an evaluation based on *Covey* during oral argument), the Tax Court considered and rejected the proposal. The Tax Court's opinion on this matter is "entitled to respect." *Harbor Bancorp & Subsidiaries,* 115 F.3d at 727.

the Tax Court correctly sustained the Commissioner's determination of deficiency in this case.

## C

■■■ Determinations made by the Commissioner in a notice of deficiency normally are presumed to be correct, and the taxpayer bears the burden of proving that those determinations are erroneous. *See INDOPCO Inc. v. Commissioner*, 503 U.S. 79, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992); *Edelson v. Commissioner*, 829 F.2d 828, 831 (9th Cir.1987). . The presumption of correctness will be rebutted if the taxpayer proves by a preponderance of the evidence that the deficiency is incorrect or was arbitrarily derived. *See In re MacFarlane*, 83 F.3d 1041, 1044 (9th Cir. 1996), *cert. denied*, 520 U.S. 1115, 117 S.Ct. 1243, 137 L.Ed.2d 326 (1997); *Herbert v. Commissioner*, 377 F.2d 65 (9th Cir.1966). Insolvency is a question of fact. *See Toledano v. Commissioner*, 362 F.2d 243, 245 (5th Cir.1966); *Smith v. Commissioner*, 249 F.2d 218 (5th Cir.1957); *Estate of Phillips v. Commissioner*, 246 F.2d 209 (5th Cir.1957); 14 MERTENS LAW OF FEDERAL INCOME TAXATION § 51.25 (1998). In the Tax Court, a party with the burden of proving a fact must do so by a preponderance of the evidence; *i.e.*, that the fact is more probable than not. *See Carson v. United States*, 560 F.2d 693, 695–96 (5th Cir.1977); *Stewart Supply Co., Inc. v. Commissioner*, 324 F.2d 233 (2d Cir.1963).[9]

■■■ The Tax Court found that Appellants failed to prove that a bankruptcy event was likely to occur. Appellants do not contest this finding on appeal. Because Appellants failed to prove that a bankruptcy event was likely to occur and therefore failed to prove that, as of August 31, 1991, they would be called upon to pay any amount to the Bank, the Tax Court correctly found that Appellants were not insolvent on August 31, 1991.[10] The Tax Court's decision sustaining the Commissioner's determinations of income tax deficiency is affirmed.

**AFFIRMED.**

O'SCANNLAIN, Circuit Judge, dissenting:

Because the majority interprets 26 U.S.C. § 108(d)(3) in a manner which I believe conflicts with the plain language of the statute, I respectfully dissent.

## I

Cancellation of indebtedness is, of course, included in income unless "the discharge occurs where the taxpayer is insolvent," where "the term 'insolvent' means the excess of liabilities over the fair market value of assets." 26 U.S.C. §§ 61(a)(12), 108(a)(1)(B), 108(d)(3). As I see it, we must decide how to treat contingent liabilities in determining whether a taxpayer's liabilities exceed his assets.

As the majority recognizes, the term "liability" is a "broad legal term ... including almost every character of hazard or responsibility, absolute, contingent, or likely." Ante at 848 (quoting *Black's Law Dictionary* 914 (6th ed.1990)). Accordingly, the plain language of section 108(d)(3) instructs us to consider all liabilities—absolute and contingent—in determining insolvency, and we are bound to follow the

---

9. With respect to examinations commenced after July 22, 1998, "[i]f, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer ... the [Commissioner] shall have the burden of proof with respect to such issue." Internal Revenue Service Restructuring Act of 1998 § 3001, 26 U.S.C.A. § 7491 (1999).

10. Appellants argue that they were obligated to pay the Bank because they breached the Letter Agreement by failing to disclose that SLC was assessed $980,512 for unpaid sales and use tax by the North Carolina Department of Revenue. This argument was not raised before the Tax Court and is thereby waived. *See Idaho First Nat. Bank v. United States*, 265 F.2d 6, 9 (9th Cir.1959).

plain meaning of the text, *see Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992); *United States v. Providence Journal Co.*, 485 U.S. 693, 700–01, 108 S.Ct. 1502, 99 L.Ed.2d 785 (1988); *Coalition for Economic Equity v. Wilson*, 122 F.3d 692, 710 (9th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 397, 139 L.Ed.2d 310 (1997); *United States v. E.C. Invs., Inc.*, 77 F.3d 327, 330 (9th Cir.1996), barring exceptional circumstances in which the text suggests a scrivener's error or an absurd result, *see United States Nat'l Bank of Oregon v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 462, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993); *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 510–11, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989); *Church of the Holy Trinity v. United States*, 143 U.S. 457, 458–59, 12 S.Ct. 511, 36 L.Ed. 226 (1892).

Notwithstanding the express statutory language, which, to repeat, instructs us to weigh liabilities against assets in determining whether a taxpayer is insolvent, the majority holds that a contingent liability is to be counted as a liability if, and only if, the taxpayer can establish that it was more likely than not that the contingent liability would eventuate. *See* Ante at 850. Under this all-or-nothing approach, a liability is counted in its entirety if the probability of occurrence exceeds 50 percent and is excluded altogether from the insolvency if the probability is equal to or less than 50 percent.

The majority bases its departure from the plain language on its belief that inclu-

sion of all contingent liabilities would lead to an "absurd result." Ante at 848. I respectfully disagree and would instead follow the lead of our sister circuits, who, in determining whether someone is insolvent in the bankruptcy context, include all contingent liabilities discounted by the probability of occurrence. *See In re Trans World Airlines, Inc.*, 134 F.3d 188, 197 (3d Cir.1998), *cert. denied*, —— U.S. ——, 118 S.Ct. 1843, 140 L.Ed.2d 1093 (1998);[1] *Covey v. Commercial Nat'l Bank*, 960 F.2d 657, 660 (7th Cir.1992); *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir.1988); *see also FDIC v. Bell*, 106 F.3d 258, 264 (8th Cir.1997) (discounting by the probability of occurrence in valuing contingent liabilities); *In re Chase & Sanborn Corp.*, 904 F.2d 588, 594–95 (11th Cir.1990) (same). This methodology values each liability at an amount equal to the liability multiplied by the probability of occurrence. For example, a taxpayer with a definite liability of $200,000 and an additional liability of $1,000,000 which is contingent and which has a 10 percent probability of occurring would have total liabilities of $200,-000 plus $1,000,000 times 10 percent, or $300,000. Accordingly, he would be insolvent if he had less than $300,000 in assets and solvent otherwise.

Despite the majority's fears, we have seen that our sister circuits have used this methodology to determine insolvency in the bankruptcy context without encountering an "absurd result." Rather, I suggest it is the majority's methodology that is problematic. The discounted liability approach better reflects the economic reali-

---

**1.** Contrary to the majority's assertions, *Trans World Airlines* does not stand for the proposition either that contingent liabilities are not to be counted in determining insolvency or that contingent liabilities are not to be discounted by probability of occurrence. That court stated quite clearly: "We agree with the bankruptcy court that it is proper to consider contingent liabilities when evaluating the insolvency of a corporation pursuant to 11 U.S.C. § 101(32)(A)." *Id.* (citing *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.L., Inc.)*, 92 F.3d 139, 156

(3d Cir.1996); *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir.1988); *Syracuse Engineering Co. v. Haight*, 97 F.2d 573, 576 (2d Cir.1938)). In each of the three cited cases—*Mellon Bank, Xonics Photochemicals*, and *Syracuse Engineering*—assets and liabilities were valued on a discounted basis. Thus, *Trans World Airlines*, read in conjunction with the Third Circuit's opinion in *Mellon Bank*, makes clear that the Third Circuit values contingent liabilities discounted by the probability of occurrence in determining insolvency.

ties of particular situations. "Discounting a contingent liability by the probability of its occurrence is good economics and therefore good law, for solvency ... is an economic term." *Covey*, 960 F.2d at 660.

The majority states that "Congress considered a debtor's ability to pay an immediate tax on discharge of indebtedness income the 'controlling factor' in determining whether the § 108(a)(1)(B) exception applies." Ante at 850. But the majority's approach is a less reliable method of measuring a debtor's ability to pay an immediate tax than is the discounted liabilities methodology, as two examples will illustrate.

Suppose that Taxpayer X has assets of one dollar and a contingent liability of one million dollars with a 50 percent probability of occurrence. Because the liability is not more likely than not to eventuate, the majority would disregard the liability in its entirety and conclude that the taxpayer is solvent. This conclusion makes little sense. Although the contingent liability is *not* more likely than not to occur, ignoring this liability results in a flawed picture of Taxpayer X's financial situation. In light of the 50 percent chance that Taxpayer X will incur a million dollar liability, his one dollar of assets does not make him solvent in any sensible interpretation of that term. In terms of what the majority characterizes as the "controlling factor"—whether the debtor has the ability to pay an immediate tax on discharge of indebtedness income— Taxpayer X is not able to pay taxes on cancellation of indebtedness income and thus should be considered insolvent.

By making the question of whether it is more likely than not that the taxpayer will be called upon to pay the liability the touchstone of its analysis, the majority fails to take into account the difference between a 50 percent and a one percent probability of occurrence. What really counts is whether assets exceed discounted liabilities. Taxpayer X's discounted liability of $500,000—50 percent times $1 million—far exceeds his $1 in assets. Thus,

contrary to the conclusion reached under the majority's methodology, he is insolvent.

In *Covey*, Judge Easterbrook framed this seemingly esoteric issue in an intuitive light. A taxpayer is solvent if people would be willing to pay to be put into the taxpayer's situation. If one would have to be paid to assume the taxpayer's package of assets and liabilities, the taxpayer is insolvent. *See Covey*, 960 F.2d at 660. Clearly, no one would be willing to pay Taxpayer X—who has only $1 in assets and a 50 percent chance of being hit with a $1 million liability—anything to assume his assets and liabilities. Instead, one would have to be paid to do so, which indicates that Taxpayer X is insolvent. By requiring Taxpayer X to pay tax on cancellation of indebtedness income, the majority undermines the tax code's policy of providing relief to insolvent taxpayers.

A second example illustrates how the majority's approach sometimes grants a tax break to solvent taxpayers who should properly be paying taxes. Take the case of Taxpayer Y, who has $900,000 in assets and a $1 million liability with a 51 percent probability of occurrence. The majority would count the liability in its entirety and deem the taxpayer insolvent because the $1,000,000 liability exceeds the $900,000 in assets. Is this person really insolvent? Our sister circuits would say he is not, because his assets ($900,000) exceed his discounted liability ($510,000). In terms of Judge Easterbrook's question, one would surely be willing to pay a positive sum to acquire $900,000 along with a expected liability of $510,000. Moreover, Taxpayer Y is fully able to pay taxes on discharge of indebtedness income. Thus, he should not benefit from the insolvency exception.

The problems inherent in the majority's analysis are made all the more evident by taking this example one step further. Suppose that the same Taxpayer Y pays the fair market rate (say, $600,000) for insurance against the 51 percent chance of

a $1,000,000 liability occurring, with the insurer agreeing to reimburse Taxpayer Y for his liability if it occurs. Voila! Taxpayer Y—who was originally insolvent under the majority's analysis—would now be fully solvent in the majority's view because, after purchasing insurance, he would have $300,000 in assets and no (uninsured) liability. There is, however, no sensible reason to treat Taxpayer Y differently depending on whether he insures against the liability. He is really solvent in both situations, as our sister circuits who use the discounted liabilities methodology would recognize.

Absurd results? In my view, Taxpayers X and Y would indeed have absurd results if the majority's approach prevails.

## II

Conceding that valuing liabilities on a discounted basis makes good economic sense, the majority limits this approach to the bankruptcy context, not the tax context. *See* Ante at 850–51. It bases this conclusion on the fact that the bankruptcy code defines the term "insolvent" slightly differently from the tax code. *Compare* 11 U.S.C. § 101(32)(A) (" '[I]nsolvent' means ... financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of ....''), *with* 26 U.S.C. § 108(d)(3) ("For purposes of this section, the term 'insolvent' means the excess of liabilities over the fair market value of assets."). As the majority interprets these two provisions, the phrase "at a fair valuation" in the bankruptcy code modifies both "debts" and "property" whereas the phrase "fair market value" in the tax code modifies only "assets." From this, the majority reasons that the bankruptcy code requires both debts and property to be valued at a fair market value, whereas the tax code requires only assets to be fairly valued. Taking this reasoning one step further, the majority concludes that the tax code requires liabilities to be valued at other than fair value.

With respect, I cannot agree with the majority's analysis. Upon closer inspection, the purported differences between 11 U.S.C. § 101(32)(A) and 26 U.S.C. § 108(d)(3) collapse, and it becomes clear that, contrary to the majority's contention, the fair value modifier in the bankruptcy code applies only to the asset side of the ledger. The placement of the phrase "at a fair valuation" directly after the word "property" in 11 U.S.C. § 101(32)(A) indicates that, as is the case with 26 U.S.C. § 108(d)(3), the fair value modifier is limited to "property" (i.e., assets); only by stretching is it possible to read this modifier to cover "debts" as well as "property." To the extent that the phrasing of the statute leaves room for reasonable disagreement over issues of grammar, it is insightful to examine 11 U.S.C. § 1(19), the prior statute from which 11 U.S.C. § 101(32)(A) was adopted, which provided:

> A person shall be deemed insolvent within the provisions of this title whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not at fair valuation be sufficient in amount to pay his debts.

11 U.S.C. § 1(19) (1966). It was clear from the placement of the phrase "at fair valuation" within section 1(19) that this modifier applied only to assets, and not to debts. Although the Bankruptcy Code of 1978 replaced section 1(19) with section 101(32), the new definition was adopted from section 1(19) with the only difference being which property is excluded. *See* S. Rep. 95–989, at 25 (1978), *reprinted in* 1978 U.S.C.C.A.N 5787, 5811 ("The definition of 'insolvent' in paragraph (26) is adopted from section 1(19) of current law. An entity is insolvent if its debts are greater than its assets, at a fair valuation, exclusive of property exempted or fraudulently transferred. It is the traditional bankruptcy balance sheet test of insolvency ....

The difference in this definition from that in current law is in the exclusion of exempt property for all purposes in the definition of insolvent.").

The conclusion that the "fair valuation" modifier in 11 U.S.C. § 101(32)(A) applies only to assets—just like the "fair market" modifier in 26 U.S.C. § 108(d)(3) applies only to assets—is bolstered by 11 U.S.C. § 101(32)(B), which defines the term "insolvent" as it applies to partnerships: " 'insolvent' means . . . with reference to a partnership, financial condition such that the sum of such partnership's debts is greater than the aggregate of, *at a fair valuation* [the partnership's assets and the sum of each general partner's nonpartnership net assets]." 11 U.S.C. § 101(32)(B). Again, it is clear from the phrasing that "at a fair valuation" modifies only assets, and there is no reason to think that Congress intended to define insolvency differently in the partnership context (covered by subsection B) than in other contexts (covered by subsection A). Thus, the majority's interpretation of 11 U.S.C. § 101(32)(A) is untenable in light of subsection (B) and former section 1(19), as the Third Circuit has expressly concluded. *See Trans World Airlines*, 134 F.3d at 196–97.

Thus, we see that the term "insolvent" is defined similarly under bankruptcy law and under tax law. In both contexts, Congress instructed us to include liabilities in determining insolvency, but did not expressly delineate how to value liabilities. As other circuits have concluded, the fact that Congress expressly provided that assets are to be fairly valued but did not so provide with respect to liabilities does not mean that liabilities must be *un*fairly valued. *See, e.g., Covey*, 960 F.2d at 660. Instead, as even the majority appears to agree, the discounting approach outlined in Part I "is good economics and therefore good law, for solvency . . . is an economic term." *Id.*

### III

Consistent with the decisions of our sister circuits and in adherence to the plain statutory language, I would reverse and remand for a proper determination of whether Appellants' assets exceeded their discounted liabilities.

