**In re DUR JAC LTD., Debtor.**

**SouthTrust Bank N.A., Plaintiff,**

**v.**

**Durward W. Jackson II and Linda Y. Jackson as Trustees of the Durward and Linda Jackson Charitable Remainder Trust, and Dur Jac Ltd., Defendant.**

**Byron C. Russell, Kelly Coley Russell, Durward W. Jackson III, Marcia Jakson, Charles Adams, Katherine C. Adams, John Walter Keene, and Karen Coley Keene, Rule 7019(a) Parties.**

**Bankruptcy No. 99–3590–WRS.**
**Adversary No. 00–30–WRS.**

United States Bankruptcy Court,
M.D. Alabama.

Aug. 14, 2000.

Janie S. Gilliland, Montgomery, AL, for Debtor.

Michael Leo Hall, Birmingham, AL, for SouthTrust Bank.

Charles A. Dauphin, Birmingham, AL, for Durward W. & Linda Y. Jackson.

## MEMORANDUM DECISION

WILLIAM R. SAWYER, Chief Judge.

This Chapter 11 case and this Adversary Proceeding are before the Court for an evidentiary hearing on: (1) the motion of SouthTrust Bank for leave to bring an adversary proceeding to recover property of the estate (Doc. 67); and (2) SouthTrust's Motion for a Preliminary Injunction which it has filed in the proposed Adversary Proceeding. (AP–3).[1] Dur Jac, Ltd., the debtor in possession here, opposes both motions. (Doc. 78). SouthTrust's motion for leave to bring the adversary proceeding was first heard, without evidence, on March 21, 2000 and taken under advisement. Dur Jac requested an evidentiary hearing on this motion (Doc. 79) which was scheduled for April 26, 2000. (Doc. 83).

At the same time it filed its motion for leave to bring the adversary proceeding, SouthTrust filed a complaint, initiating Adversary Proceeding 00–30 and moved for a preliminary injunction. (AP–1, 3). The Court conducted a status conference on the adversary proceeding on March 21, 2000, at the same time that it heard South-

---

1. References to documents in the main case file will be as follows: (Doc. 67). Which, for example, is the motion of SouthTrust for leave to bring this adversary proceeding. References to documents in the adversary proceeding file for Adversary Proceeding No. 00–30 will be as follows: (AP–3), which is SouthTrust's Motion for Preliminary Injunction.

Trust's motion to bring the adversary proceeding. As the two matters involve common issues of fact, the Court decided that one evidentiary hearing should be had on both matters.

On April 26, 2000, the Court conducted an evidentiary hearing on the two matters described above. Present were Michael L. Hall and James J. Robinson, attorneys for the plaintiff SouthTrust Bank, Janie S. Gilliland, attorney for Dur Jac, and Charles A. Daupin, attorney for the Jacksons as Trustees of the Charitable Remainder Trust. The Jacksons' children, designated Rule 7019(a) parties in the pleadings, have not answered or appeared. Pursuant to Bankruptcy Rule 7052, the Court now makes its findings of fact and conclusions of law.

### FINDINGS OF FACT

Dur Jac is an Alabama limited partnership whose two principals are Durward W. Jackson, II and Linda Jackson. (AP-1). Dur Jac filed a petition in bankruptcy pursuant to Chapter 11 of the Bankruptcy Code on July 22, 1999, (Doc. 1) and has been acting as a debtor in possession since that time. Neither a trustee nor an examiner has been appointed, nor has a request been made by SouthTrust, or any other party in interest, for the appointment of one. *See*, 11 U.S.C. § 1104. Both Dur Jac and SouthTrust have proposed competing Chapter 11 Plans, which are currently scheduled for hearing on confirmation on August 24, 2000.

Examination of the Debtor's Schedules, Statement of Financial Affairs and Disclosure Statement and the Disclosure Statement filed by SouthTrust, establish the following facts. Dur Jac is an investment company which holds various assets for investment purposes. At the time of filing, its principal assets were (1) stock in

AutoNation, (2) an interest in the Cane Brake Development, a real estate development, (3) two beach front condominiums, (4) first mortgages on the homes of four of the Jacksons' adult children, (5) a business condominium and a promissory note. The AutoNation stock, which served as collateral for the indebtedness to SouthTrust has been liquidated and the proceeds, in the approximate amount of $5.1 million, applied to the indebtedness. The interest in Canebrake Development has been liquidated and the proceeds paid to AmSouth Bank, reducing its indebtedness to approximately $350,000.[2] SouthTrust estimates that its unsecured deficiency claim, after application of the proceeds of its collateral will be $2.1 million.[3]

In the proposed adversary proceeding, SouthTrust seeks to recover, for the benefit of the bankrupt estate, four mortgages which are secured by the residences of four children of Durward and Linda Jackson together with their spouses. SouthTrust contends that the mortgages are property of the estate while Dur Jac contends that they are the property of the Trust. These mortgages are as follows:

1. Mortgage dated October 31, 1996 from Durward W. Jackson III, and Marcia Jackson to Durward W. Jackson, II, on certain property situated in Glynn County, Georgia securing a Promissory Note dated October 30, 1996 in the principal amount of $183,000. (Plaintiff's Exhibits 212 and 213).

2. Mortgage dated January 22, 1996 from Byron C. Russell, Jr. and Kelly Coley Russell to Durward Jackson, II, on certain real property situated in Fulton County, Georgia, securing a promissory note dated January 22, 1996 in the principal amount of $207,500.00 and a promissory note dated August 8, 1996 in the principal amount of

---

**2.** This figure is only an estimate for the purposes of showing the Debtor's general financial condition. The Court is not, at this time, making a finding as to the amount of AmSouth's unsecured deficiency claim.

**3.** This figure is also an estimate. There is pending and proposed litigation which could have a material impact on the ultimate indebtedness.

$48,133.62. (Plaintiff's Exhibits 214 and 215).

3. Mortgage dated May 1, 1996 from Karen Coley Keene and John Walter Keene to Durward W. Jackson, II, on certain real property situated in Montgomery County, Alabama, securing a promissory note dated May 1, 1996 in the principal amount of $220,000. (Plaintiff's Exhibits 216 and 217).

4. Mortgage dated October 14, 1994 from Katherine C. Adams and Charles Adams to Durward Jackson, II, on certain real property situated in Montgomery County, Alabama, securing an indebtedness in the principal amount of $140,000. (Plaintiff's Exhibit 211).

In August of 1998, SouthTrust made a loan in the amount of $2,000,000 to Canebrake Properties, L.L.C., a limited liability company which is owned and controlled by Durward Jackson, II. (Plaintiff's Exhibit 66). The purpose of the loan was to provide interim financing for the Canebrake real estate development. It was intended that this $2,000,000 loan would be interim financing which would be paid from the proceeds of financing long-term financing which would be provided by AmSouth Bank. It is undisputed that AmSouth made the loan and that this $2,000,000 loan from SouthTrust was paid in full. The parties have referred to this $2,000,000 loan from SouthTrust as the "bridge loan." The precise date that this payment was made is not in evidence. However, it necessarily had to have been made after August 4, 1998 (the date that the bridge loan was made) and prior to July 8, 1999 (the date that Durward Jackson, II assigned the mortgages to the Trust). In any event, the bridge loan was paid within the one year prior to the date of the Chapter 11 petition in this case.

The bridge loan was secured by eight different groups or items of collateral, one of which was the four mortgages, described above, to the Jacksons' children. The other seven groups or items are mentioned in the bridge note (Plaintiff's Exhibit 66) but not are not otherwise material to the issues before this Court. The mortgagee, as indicated on the face of the four mortgages in question, is Durward Jackson, II. The four mortgages were assigned by Durward Jackson, II to Dur Jac by way of three separate Assignment of Mortgage documents, two of which were dated August 4, 1998 and one of which was dated August 3, 1998. (Plaintiffs' Exhibits 71, 72 and 73). The effect of these three assignments was to transfer the mortgages from Durward Jackson, II to Dur Jac. Simultaneous to the assignment to Dur Jac, the mortgages were transferred from Dur Jac to SouthTrust by way of three documents entitled "Collateral Assignment of Note and Mortgage" two of which were dated August 4, 1998 and one of which was dated August 3, 1998. (Plaintiffs' Exhibits 74, 75 and 76). These six documents effected a transfer from Durward Jackson, II to Dur Jac and then from Dur Jac to SouthTrust. None of these assignment documents were recorded.

The dispute here concerns the operation of the assignment documents upon payment of the bridge loan. The documents clearly indicate that the mortgages were assigned by Mr. Jackson to Dur Jac and in turn by Dur Jac to SouthTrust, all of which occurred on August 3 or August 4, 1998. SouthTrust contends that upon satisfaction of the bridge loan, the assignment to SouthTrust was no longer effective, leaving the mortgages in the hands of Dur Jac. Dur Jac and the Trust contend that upon satisfaction of the bridge loan, none of the assignments were effective, leaving the mortgages in the hands of Durward Jackson, II.

On July 8, 1999, two weeks prior to the filing of the petition in bankruptcy, three separate assignment documents were executed purporting to assign the mortgages from Durward Jackson, II and Linda Jackson to Durward Jackson, II and Linda Jackson as co-trustees of the Durward Jackson and Linda Jackson Charitable Re-

mainder Trust created under an agreement of trust dated December 20, 1996. (Defendants' Exhibits 15, 16 and 17). These assignments were recorded while the assignments to Dur Jac and South-Trust were not recorded. In addition, there were no other assignment documents other than the six documents described above.

Durward Jackson, II testified to the effect that the mortgage assignments to Dur Jac and SouthTrust were made in conjunction with the bridge loan for the purpose of securing it and that the assignments were to be of no effect after the loan was satisfied.[4] Mr. Jackson further testified to the effect that it was the intention of all interested parties that he was to retain ownership of the mortgages and that the assignments were executed to accommodate the bank and secure the bridge loan. No consideration was paid to Mr. Jackson by Dur Jac for the assignment, notwithstanding the recitals to the contrary, and it is reasonable to assume that it was the intention of parties that the assignment to Dur Jac was of no effect after satisfaction of the bridge loan.

Mr. Jackson offered further evidence of his ownership of the mortgages in that his 1996, 1997 and 1998 Federal income tax returns report the receipt of interest income on the mortgages. (Defendant's Exhibits 5, 6 and 7). In addition, Mr. Jackson offered IRS Forms 1098 for the year 1999 which further reflect the receipt of interest income by him with respect to the mortgages. (Defendant's Exhibit 8). SouthTrust offered copies of Dur Jac's accounting journal reflecting receipt of the mortgage payments from the Jackson children in an effort to support their contention, that the mortgages were the property of Dur Jac. (Plaintiff's Exhibit 251). However, Dur Jac's accountant testified that these entries indicate that Durward Jackson's capital account was credited with these amounts. In other words, Dur Jac's receipt of these payments was treated as a contribution to its capital by Mr. Jackson. These documents are all consistent with the proposition that Mr. Jackson owned the mortgages.

Of considerable interest is a letter to Kaufman & Rothfeder, a Montgomery law firm, from SouthTrust dated July 15, 1998. (Defendant's Exhibit 107). In that letter, SouthTrust instructs Kaufman & Rothfeder to take certain action on its behalf relating to the bridge loan, including the preparation of the assignments to Dur Jac and to SouthTrust. (Exhibits 71 to 76 inclusive). These documents were all prepared by Kaufman & Rothfeder on the instructions of SouthTrust Bank, at the same time, for the purpose of securing the bridge loan. At the evidentiary hearing, SouthTrust's lawyers took the position that the assignment from Dur Jac to SouthTrust terminated by the terms of the assignment upon satisfaction of the bridge loan, while the assignment from Durward Jackson II to Dur Jac did not because it did not have comparable language. That construction of the documents is too stilted, in light of the facts of this case. Rather, the more natural construction, which best fits the evidence is that upon satisfaction of the bridge loan, none of the assignments were of effect, leaving the mortgages in the hands of Durward Jackson II.

The SouthTrust letter to Kaufman & Rothfeder is perplexing in that Mr. Jackson testified that Kaufman & Rothfeder had been his attorney and the attorney for

---

4. An apparent inconsistency in Mr. Jackson's testimony can be resolved if one regards the assignments as security interests rather than absolute transfers. Under the express terms of the Collateral Assignment documents, Mr. Jackson was given the right to collect the mortgage payments, so long as the bridge note was not in default. Such a provision suggests a security interest rather than an absolute transfer. This provision is plainly inconsistent with the Bank's contention, that the mortgages were to be assigned, for all time, to Dur Jac. This provision in the Collateral Assignments together with Mr. Jackson's testimony, support Dur Jac's contention that the mortgages were to remain the property of Mr. Jackson and not Dur Jac after satisfaction of the bridge note.

his business interests for many years. Kaufman & Rothfeder, according to Mr. Jackson, held voluminous files and records of his and his various entities, including Dur Jac. While this Court has no reason to make a determination whether Kaufman & Rothfeder did anything improper in its representation of either Dur Jac, Mr. Jackson or SouthTrust, this Court will find that the assignment documents in question here were drafted pursuant to instructions given by SouthTrust. For this reason, any ambiguities in the documents will be resolved against SouthTrust.[5] *Brewbaker Motors, Inc. v. Belser*, 2000 WL 1073712, —— So.2d —— (Ala.); *Strickland v. General Motors Acceptance Corporation*, 578 So.2d 1275, 1277 (Ala.1991).

Dur Jac offered three unexecuted UCC–1 (financing statements) which they contend further support their position. (Defendants Exhibits 1, 2 and 3). These financing statements, if executed, may have arguably given SouthTrust a security interest in the mortgages.[6] Mr. Jackson testified that he was presented with these financing statements by the Bank and that he adamantly refused as he saw this as being contrary to his agreement with the Bank and as improper overreaching on their part. The Bank pointed out that because Dur Jac was named as the Debtor, it had taken a consistent, and it would argue, correct position that as of May 12, 1999, the date the documents were apparently prepared, that Dur Jac and not Durward Jackson, II was the owner of the mortgages. While these documents are not conclusive one way or the other, they do lend further support to the Defendants. Mr. Jackson's refusal to sign the financing statements is consistent with his position

that he and not Dur Jac owned the mortgages.

Considering all of the evidence, the Court concludes that the various assignments of the mortgages were made in an effort to secure, in part, a bridge loan which was later paid. Upon payment of the bridge loan, none of the six assignments in question (Plaintiff's Exhibits 71 to 76 inclusive) were of any effect. Therefore, upon payment of the bridge loan, the mortgages in question were owned by Durward Jackson, II.

## CONCLUSIONS OF LAW

The question here is whether SouthTrust, a creditor, may bring this adversary proceeding to recover property of the estate, for the benefit of the estate and, if so, under what circumstances. In the proposed adversary proceeding, SouthTrust seeks declaratory relief in the form of a determination that the mortgages in question are the property of Dur Jac and an injunction to ensure that their proceeds are paid into the estate. (AP–1).

In cases under Chapter 11, the debtor usually acts as his own trustee. 11 U.S.C. § 1107. When a debtor is acting as his own trustee, he is referred to as a "debtor in possession." *Id.* It is the exclusive function of the debtor in possession, to collect the property of the estate and reduce it to money. 11 U.S.C. §§ 1107, 1108. If a creditor is of a view that the debtor in possession is not acting appropriately, the Bankruptcy Code provides that he may: (1) move for the appointment of a trustee or examiner pursuant to 11 U.S.C. § 1104; (2) move for conversion of the case to a case under Chapter 7 pursuant to 11 U.S.C. § 1112;

---

**5.** SouthTrust may claim that this presumption should not work against them here as they claim to be standing in the shoes of Dur Jac and are not representing their own interests. Looking through the thicket of contracts and corporate entities here, there are in reality only two interests. Those of Mr. Jackson and those of SouthTrust. The Bank should not be

permitted to benefit from an ambiguity created by their lawyers.

**6.** This leaves aside the question whether a security interest in a mortgage may be perfected by filing a UCC–1, as such documents are normally used to create security interests in personal property.

or (3) move for dismissal of the case. *Id.* SouthTrust has not sought any of these three forms of relief.

The leading case on the question whether a creditor may bring suit on behalf of a debtor in possession, was handed down by the United States Court of Appeals for the Seventh Circuit in *In re Xonics Photochemical, Inc.*, 841 F.2d 198 (7th Cir.1988). In this case, the Court held that:

> The right to invoke these provisions [sections 544 and 548] belongs not to a particular unsecured creditor such as Mitsui but to the trustee (or debtor in possession) as the representative of all the unsecured creditors.

* * *

An alternative route possibly open to Mitsui [citations omitted] was to ask the bankruptcy court to allow it to bring a form of derivative suit in the name of the debtor. But before it could do any such thing it would have to convince the court that the debtor was shirking his statutory responsibilities.

*Id.* at 202–03; *See also Matter of Vitreous Steel Products Company*, 911 F.2d 1223, 1230 (7th Cir.1990); *Nebraska State Bank v. Jones*, 846 F.2d 477, 478 (8th Cir.1988).

In an analogous case, the Fifth Circuit has held that a creditors committee had standing to bring suit against the officers and directors of the debtor, finding cause in the clear conflict of interest in such a suit. *Louisiana World Exposition v. Federal Insurance Company*, 858 F.2d 233, 244–53 (5th Cir.1988); *See also Equitable Gas Co. v. Equibank N.A. (In re McKeesport Steel Castings Co.)*, 799 F.2d 91, 93 (3rd Cir.1986) (individual creditor may have standing to bring action under bankruptcy provision even though provision states that only a trustee may act); *In re Morrison*, 69 B.R. 586, 589 (Bankr.E.D.Pa. 1987) (creditors may act in lieu of trustee where trustee either refuses or has no reason to act). The Fifth Circuit in this case distilled the following elements which

must be shown before standing will be given. First, there must be a colorable claim; second, there must be an unjustified refusal on the part of the debtor in possession to pursue the claim; and third, leave must be given by the bankruptcy court to pursue the claim. *Id.* at 247; *Matter of Perkins*, 902 F.2d 1254, 1258 (7th Cir.1990); *Unsecured Creditors Committee of Debtor STN Enterprises, Inc. v. Noyes (In re STN Enterprises)*, 779 F.2d 901, 904 (2nd Cir.1985).

In a more recent decision, the Sixth Circuit granted leave to a creditor to bring a fraudulent conveyance suit. *Canadian Pacific Forest Products Limited v. J.D. Irving, Limited (In re The Gibson Group)*, 66 F.3d 1436 (6th Cir.1995). The Sixth Circuit thoroughly examined reported case law on the question, including *Xonics* and *Louisiana World*, and held as follows:

> We believe that Congress has not precluded the bankruptcy court from granting standing to a creditor if such standing further Congress's purpose in creating the avoidance action found in 11 U.S.C. §§ 547 and 548 in the contest of a Chapter 11 reorganization. We decide, therefore, that a bankruptcy court may permit a single creditor in a Chapter 11 case to initiate an action to avoid a preferential or fraudulent transfer instead of the debtor-in-possession if the creditor; 1) has alleged a colorable claim that would benefit the estate, if successful, based on a cost-benefit analysis performed by the bankruptcy court; 2) has made a demand on the debtor-in-possession to file the avoidance action; 3) the demand has been refused; and 4) the refusal is unjustified in light of the statutory obligations and fiduciary duties of the debtor-in-possession in a chapter 11 reorganization.

*In re The Gibson Group*, 66 F.3d 1436, 1438. As neither the United States Su-

preme Court[7] nor the United States Court of Appeals for the Eleventh Circuit has ruled upon this question, and because this Court finds the reasoning of the Sixth Circuit in *The Gibson Group* persuasive, that four-part test will be applied here. However, in making this determination it should be borne in mind that this is an extraordinary remedy which should be applied sparingly.

■ The first element of the four part test set out in *The Gibson Group*, is whether there is a colorable claim. Examination of the facts of this case leads to the conclusion that there is. On July 8, 1999, two weeks prior to the filing of the petition in this case, the four mortgages in question, which appear to have been property of Dur Jac at some point in time, were transferred to a trust. The mortgages in question were on the residences of four of Mr. and Mrs. Jacksons' children. Moreover, Durward and Linda Jackson are the trustees of the trust. The transfers are to or from closely-related parties on the eve of a bankruptcy filing. While the court concludes that there was no impropriety insofar as the estate of Dur Jac is concerned, admittedly there was a colorable claim.

■ The Court concludes that the next two elements are present, even though the evidence is conflicting. On the one hand, it does not appear that SouthTrust ever made a demand that the Debtor bring this suit. On the other hand, Dur Jac has vigorously defended this suit, denying the mortgages are property of the estate. Moreover, SouthTrust contends that it would be a futile gesture to demand that Durward Jackson, on behalf of Dur Jac, sue his children and stepchildren. Cases such as this highlight the tension involved where a debtor in possession, acting as his own trustee, is required to consider filing suit against his own children and stepchildren. The obvious conflict of interest in a case such as this calls for close scrutiny by the Court when transactions with related parties are involved. Technically, it may have been preferable to require South-Trust to make a formal demand prior to seeking leave to bring suit. However, in this case the Court finds that it would have been a futile gesture. Based upon the facts and circumstances here, the Court finds that the second and third elements, demand and refusal, have been met.

■ As for the fourth element, based upon the evidence, the Court concludes that Dur Jac's refusal to bring suit was justified. The facts, as found by this Court after an evidentiary hearing, are that the mortgages in question were the property of Durward Jackson, II upon satisfaction of the bridge loan. Durward Jackson, II who is a principal of Dur Jac, a trustee for the trust and the father or stepfather of the mortgagors, was in possession of sufficient facts to make the determination as to the proper ownership of the mortgages.

■ SouthTrust contends that much of the evidence offered at the evidentiary hearing should have been barred by the parol evidence rule. The Bank contends that the agreements are clear on their face and that extrinsic evidence should not be permitted to vary the terms of the written agreements. *Mariott Intern., Inc. v. de-Celle*, 722 So.2d 760 (Ala.1998); *Gabrielson v. Healthcorp of Eufaula, Inc.*, 628 So.2d 411 (Ala.1993). However, the parol evidence rule does not bar such evidence where, as here, the terms of the agree-

---

**7.** The Supreme Court handed down a decision on May 30, 2000 in *Hartford Underwriters Insurance Company v. Union Planters Bank, N.A.*, 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000), which held that a creditor may not avail itself of Section 506(c) as its plain language limits its application to the trustee. At footnote 5 of the opinion, the Supreme Court cites both *Xonics* and *The Gibson Group* and expressly declines to decide whether creditors may bring avoidance actions under either Section 547 or 548. As the Supreme Court found that those cases were not analogous, it follows that *Hartford Underwriters Insurance* is not analogous here.

ments are ambiguous and evidence is needed to clarify the contract's meaning. *Cummings v. Hill,* 518 So.2d 1246 (Ala. 1987); *Poole v. Henderson, Black and Greene, Inc.,* 584 So.2d 485 (Ala.1991). Additionally, whether a contract is ambiguous is a question of law for the court to determine. *Fouts v. Beall,* 518 So.2d 1236 (Ala.1987); *Rime–Shatten Development Co. v. Birmingham Cable Communications, Inc.,* 569 So.2d 332 (Ala.1990).

■ The evidence was undisputed that the assignments to Dur Jac and to South-Trust were not later reversed by way of additional written assignments or releases. Rather, SouthTrust contends that by the terms of its assignment, it was automatically assigned back upon satisfaction of the bridge loan. Paragraph 4 of these assignments states as follows:

> Assignors further agree that this Collateral Assignment is to remain in full force and effect so long as the Note remains unpaid and that it may be enforced by Assignee, its successors and assigns, or the holder of the Note.

Plaintiff's Exhibits 74, 75 and 76.[8]

In addition, Paragraph 7 states as follows:

> This Collateral Assignment may not be changed or terminated except by written agreement between all of the parties hereto.

Paragraph 4 explicitly provides that the assignment remains in effect so long as the Note remains unpaid but does not explicitly state what happens upon satisfaction of the Note. There are three possibilities. First, that even after payment of the note, the assignment remains effective. This reading is plausible as there is explicit language of transfer but none concerning the effect of the payment of the bridge loan. The second reading is that after payment of the note, the assignment to SouthTrust is no longer effective but

the assignment to Dur Jac is. This is plausible as paragraph 4 of the Collateral Assignments sets out the rights of South-Trust in the event of a default in the bridge loan. The third reading, that none of the assignments are effective after payment of the note follows from the same language and the Court finds is the most plausible. As there are at least three plausible readings of the written instruments in question, the terms of the assignments are ambiguous and extrinsic evidence is needed to clarify the meaning of the various writings.

Paragraph 1 of the assignment states that "[a]ssignors collectively and individually, do hereby assign, grant, transfer and set over to the Assignee, all rights [in the various mortgages]." Paragraph 4 would appear to be superfluous. As Paragraph 1 provides explicit language of transfer or assignment, the language of Paragraph 4 appears to be redundant. The recital portion of the assignment sets forth that it is for the purpose of securing the bridge loan. Any construction of the assignment which would hold that it was not effective, while the bridge loan was outstanding, would be illogical and contrary to the plain language of the documents and the intention of the parties.

Rather, it appears that the language of Paragraph 4 begs the inference that it is not in effect if the Note is paid. Why the assignment does not make this explicit is not clear. It would have been a simple matter to state explicitly that the mortgages would revert either to Dur Jac or to Durward Jackson, II upon satisfaction of the bridge loan. If Paragraph 4 is given the construction that the assignment is not effective after payment of the Note, then it is no longer superfluous. The Bank has not urged the contrary construction of Paragraph 4, which is that the assignment, to the Bank, is effective even after payment of the Note. Such a construction

8. The language of the three Collateral Assignment documents, Plaintiff's Exhibits 74, 75 and 76 are identical.

would be contrary to the intention of the parties as demonstrated by evidence.

If the Court draws the inference that the assignment to SouthTrust is somehow undone, that is no longer effective, upon payment of the bridge note, the next question is: what is undone? SouthTrust urges that only the assignment from Dur Jac to SouthTrust is undone, leaving the mortgages in the hands of Dur Jac. On the other hand, Dur Jac contends that the assignment from Durward Jackson, II to Dur Jac would likewise be undone, leaving the mortgages in the hands of Durward Jackson, II. As all of the assignments were prepared by Kaufman & Rothfeder, at the instruction of SouthTrust, at the same time and for the single purpose of securing the bridge loan, the most logical construction is to read all seven of these documents together (six assignment documents and the bridge note) and conclude that all of the assignments were "undone" or no longer effective upon satisfaction of the bridge loan and that when all the dust settled, Durward Jackson, II was holding the mortgages, free of any encumbrance from the bridge loan. This construction is the most logical construction of the written instruments and best fits the evidence. The Bank's parol evidence argument is without merit.

SouthTrust argues in its Reply Brief that even if the Court were to find that "such a concocted 're-conveyance' had occurred, which it did not, this conveyance would have occurred less than one year prior to the filing of bankruptcy. As such, the conveyance would be both within the insider preference period and a fraudulent transfer, and therefore voidable anyway." (AP–26, p. 5). This argument fails for at least two reasons. First, SouthTrust did not plead either fraudulent conveyance or preference theories in its complaint. Second, and more important, the evidence does not support either theory. At some point in time, the exact date is not in evidence, the bridge loan was paid and the assignments of the mortgages were no longer, in the words of the collateral assignments, effective. Whether such a state of affairs was "magical" or "concocted," (*See*, SouthTrust's Reply Brief, AP–26, pp. 4–5), it came about as a result of the instruments drafted by a law firm which represented SouthTrust and was acting under their express direction. SouthTrust would have the Court look at only the assignments from Durward Jackson to Dur Jac (Plaintiff's Exhibits 71, 72 and 73) in isolation, ignoring the fact they were just one small piece of a much larger transaction. Rather, considering all of the assignment documents and the bridge note together (Plaintiff's Exhibits 66 and 71–76), the most logical conclusion is that none of the six assignments were effective after satisfaction of the bridge note.

It is of least passing interest that courts considering this question have uniformly held that, in the context of a case under Chapter 7, creditors do not have standing to bring suits such as this. *National American Insurance Company v. Ruppert Landscaping Company, Inc.,* 187 F.3d 439 (4th Cir.1999), *cert. denied* —— U.S. ——, 120 S.Ct. 1162, 145 L.Ed.2d 1073 (2000)(creditors could not bring suit in the nature of fraudulent conveyance action until the Chapter 7 Trustee abandoned the cause of action); *Sturgeon State Bank v. Perkey (In re Perkey),* 194 B.R. 846 (Bankr.W.D.Mo.1996)(creditor did not have standing to bring fraudulent conveyance suit but permitted Chapter 7 Trustee to be substituted as a party); *NBD Bank, N.A. v. Fletcher (In re Fletcher),* 176 B.R. 445 (Bankr.W.D.Mich.1995)(Chapter 7 Trustee and not individual creditors had standing to bring fraudulent conveyance suit). The facts of this case do not create a situation which would cause the Court to depart from the typical scenario where only the trustee or the debtor in possession have standing to bring suit on behalf of the estate.

The Court DENIES the motion of SouthTrust for leave to bring the adversary proceeding, which seeks declaratory

and injunctive relief. Dur Jac's refusal to bring suit against the Jacksons' children was justifiable under the facts of this case. As the Court has denied SouthTrust's motion for leave to bring this adversary proceeding, the Motion for Preliminary Injunction is DENIED as MOOT. Moreover, as SouthTrust has been denied leave to bring Adversary Proceeding 00–30, it is DISMISSED. The Court will enter separate orders in the main case on the motion for leave and an order of dismissal in the Adversary Proceeding.